

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| ADVANTAGE BUILDINGS & EXTERIORS, INC., | WD76880 |
| Respondent, | OPINION FILED: |
| v. | September 2, 2014 |
| MID-CONTINENT CASUALTY COMPANY, | |
| Appellant. | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Wesley Brent Powell, Judge**

**Before Division Two: Victor C. Howard, P.J., James Edward Welsh, and Anthony Rex Gabbert, JJ.**

Mid-Continent Casualty Company appeals the circuit court's entry of final judgment on a jury verdict in favor of Advantage Buildings & Exteriors, Inc., on Advantage's bad-faith failure-to-settle claim. The jury awarded Advantage both compensatory and punitive damages. We affirm in part and reverse in part.

### Factual and Procedural Background

In July 2008, Advantage was sued by Alsation Land Company, Vallejo, LLC, for breach of warranty, negligence, and property damage as a result of construction defects in a building for which Advantage had supplied the exterior wall panels. Advantage tendered the claim to its

insurer, Mid-Continent, with whom it held a Commercial General Liability (CGL) insurance policy, with a $1,000,000 policy limit for each occurrence, and a $2,000,000 umbrella policy. [1]

Mid-Continent informed Advantage by letter dated August 12, 2008, that it would investigate the claim and perform a coverage analysis but that it was reserving its right to assert that there may be no duty to defend or indemnify against Alsation's claims. In conclusion, the letter stated that Mid-Continent "will promptly advise you of the outcome of our coverage analysis." On September 2nd, Mid-Continent sent Advantage another letter stating that it would conditionally accept the defense of Advantage in the litigation (while still reserving its rights) and advising that it had hired an attorney, Eric Swanson, to defend Advantage. The second letter promised that "[i]f other facts come to our attention, we will promptly inform you of them."

Early on, Attorney Swanson recognized that Advantage was exposed to millions of dollars in damages and advised Mid-Continent that "Alsation will ultimately prevail at trial." He advised Mid-Continent to settle the claims. Despite that advice, Mid-Continent did not make any settlement offers to Alsation on Advantage's behalf. Although Mid-Continent concluded that its coverage was limited to approximately $53,000 in interior damages to Alsation's building, it failed to inform Advantage of that fact.

After more than a year without hearing from Mid-Continent, Advantage hired its own counsel, Phil Richards, who on June 2, 2010, demanded in writing that Mid-Continent settle Alsation's claim within the insurance policy limits due to the likelihood that Advantage would face liability exposure in excess of the policy limits. Mid-Continent did not respond.

---

[1]Alsation also sued Walton Construction Company, LLC, the general contractor, for negligent design, manufacture, and construction of the building. Walton later filed a third-party claim against The Bratton Corporation, the subcontractor that erected the steel for the building and hung the exterior wall panels.

Alsation and all the defendants in the underlying litigation participated in a final mediation on July 10, 2010. Mid-Continent attended on behalf of Advantage. Mid-Continent had concluded that Advantage faced substantial "uncovered exposure" in October 2009, nine months earlier, and noted in its case file that Advantage should attend mediation for that reason. Mid-Continent did not advise Advantage of those determinations, however, until five days after the mediation, on July 15.

Alsation sought hundreds of thousands of dollars from Advantage at the mediation, but Mid-Continent gave Swanson the authority to offer only $50,000 on Advantage's behalf. Due to its refusal to make any meaningful effort to settle, the mediator asked Mid-Continent to leave. Alsation settled with Walton and third-party defendant Bratton for $2,400,000.[2] This left Advantage as the only defendant in Alsation's upcoming trial with only a few days to prepare.

Two days after the mediation, on July 12, Attorney Richards demanded that Mid-Continent settle the case within policy limits. That same day, Alsation's attorney wrote Advantage and made an offer to settle all of Alsation's claims against Advantage for $800,000. Mid-Continent did not respond to the offer. Alsation made another settlement offer on July 21 for the policy limit of $1,000,000. Mid-Continent did not respond to that offer either, and the final offer to settle within policy limits expired.

On July 14, Mid-Continent filed a declaratory judgment action against Advantage, Alsation, and Walton, seeking a declaration that it had no obligation under the CGL or umbrella policies to defend or indemnify Advantage in connection with Alsation's claims.

The next day, on July 15--four days before the scheduled trial date and nearly two years after Mid-Continent had promised to "promptly" advise Advantage about its coverage analysis--

---

[2]Alsation later settled its claims against the architectural firm on the project, as well.

Mid-Continent finally informed Advantage's counsel by letter that its policy did not cover most of Alsation's $3 million claim against Advantage. The expert witness on whom Advantage had intended to rely could not testify for Advantage at trial. Thus, the case was set for trial on July 19th, and Advantage had no expert witness to refute Alsation's claimed damages.

Consequently, Advantage entered into an agreement with Alsation under which it agreed to pay Alsation $500, to sue Mid-Continent for any claims it might have, and to give Alsation the proceeds of those claims. Alsation agreed to not execute on any judgment against Advantage, to fund Advantage's claims against Mid-Continent, and to accept whatever damages Advantage could recover from Mid-Continent in full satisfaction of its claim.

On July 22, 2010, Alsation and Advantage appeared before the circuit court for a bench trial. Following Alsation's presentation of evidence, the court concluded that Advantage was negligent and awarded Alsation $4,604,000 in damages for diminution-in-value, ordering that Advantage "shall receive credit for amounts paid" by Walton and Bratton.

Mid-Continent then amended its declaratory judgment petition, seeking a declaration that it was not contractually liable to Advantage for the amount of the Alsation judgment. Advantage filed a counterclaim against Mid-Continent alleging bad-faith failure to settle.

Mid-Continent moved for summary judgment on its declaratory judgment action and on Advantage's bad-faith claim. In January 2012, the court granted summary judgment for Mid-Continent on its claim that it was not liable to Advantage for the Alsation judgment. The court held that Oklahoma law governed the coverage issue and that, under Oklahoma law, Advantage's policy did not provide coverage for Alsation's claims. The court held that Missouri law applied to Advantage's bad-faith claim and denied Mid-Continent's summary judgment motion on that claim due to the fact that "bad faith is generally a fact question."

4

In June 2012, Advantage's bad-faith failure to settle claim against Mid-Continent was tried before a jury. Advantage sought compensatory and punitive damages, and Mid-Continent requested a bifurcated trial, pursuant to section 510.263, RSMo.[3] Advantage claimed the $4,604,000 Alsation judgment as its compensatory damages. The court did not permit Mid-Continent to tell the jury about the declaratory judgment ruling that there was no coverage for Alsation's claim.

Following the first stage of trial, the jury found in favor of Advantage on its bad-faith claim, awarded $3,000,000 in damages, and found that Mid-Continent was liable for punitive damages. In the second stage, the jury awarded Advantage $2,000,000 in punitive damages.

Mid-Continent filed a motion for set-off seeking to reduce the jury award by the amount of Alsation's settlements with Walton and Bratton. The court ultimately denied that motion and entered final judgment on the jury's verdicts. The court also denied Mid-Continent's post-trial motions for remittitur and for judgment notwithstanding the verdict (JNOV) or new trial.

## Liability Issues

Mid-Continent raises ten points on appeal. We first address its claims related to liability for compensatory damages (Points I-III and VII-VIII). In Points I and III, Mid-Continent contends that the circuit court erred in denying its motion for JNOV on Advantage's bad-faith failure to settle claim in which Mid-Continent argued that Advantage did not make a submissible case for bad faith.

---

[3]Statutory references are to the Revised Statutes of Missouri (RSMo) 2000, as updated by the 2011 Cumulative Supplement.

We review the denial of a JNOV motion *de novo* to determine whether the plaintiff made a submissible case. *See Rinehart v. Shelter Gen. Ins. Co.*, 261 S.W.3d 583, 595 (Mo. App. 2008). That court explained that:

> To make a submissible case, a plaintiff must present substantial evidence regarding every fact essential to liability. Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case. In determining whether a plaintiff has made a submissible case, we presume that the plaintiff's evidence is true and disregard any of the defendant's evidence which does not support plaintiff's case. We view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff.

*Id.* (citations omitted). "It is only *where there is a complete absence of probative fact to support the jury's conclusion* that this Court will decide [that] the plaintiff did not make a submissible case." *Id.* (emphasis added).

Under Missouri law, "[a]n insurance company has a duty to defend an insured when the insured is exposed to *potential* liability to pay based on the facts known at the outset of the case." *Truck Ins. Exch. v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo. App. 2005). This is true "no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable." *Id.* The duty to defend potentially insured claims arises "even though claims beyond coverage may also be present."[4] *Id.* Coverage is determined by comparing the policy with the allegations in the pleadings. *Id.*

"Upon *proper notice* to the insured, Missouri law permits an insurer to defend its insured but reserve the right to later disclaim coverage." *Id.* at 88 (emphasis added). If the "*fully-notified* insured" accepts the insurer's defense under a reservation of rights, then the insurer's

---

[4]Here, Mid-Continent determined that its coverage for Advantage was limited, at the most, to the interior damages to Alsation's building, which totaled approximately $50,000. Because there was at least potential coverage at the outset of the case under Mid-Continent's policy for at least a portion of the damages claimed, Mid-Continent owed Advantage a duty to defend it against the entire lawsuit.

6

offer will not be considered a denial of coverage. *Id.* (citing *Brooner & Assocs. Constr., Inc. v. W. Cas. & Sur. Co.*, 760 S.W.2d 445, 447-48 (Mo. App. 1988)) (emphasis added).

However, the insurer owes the insured a duty to assert a *proper* reservation of rights that is timely and clear and that fully informs the insured of its position. *See Kinnaman-Carson v. Westport Ins. Corp.*, 283 S.W.3d 761, 765 (Mo. banc 2009); *see also Butters v. City of Independence*, 513 S.W.2d 418, 424-25 (Mo. 1974); *Brooner*, 760 S.W.2d at 447. The insurer must conduct any investigation and analysis of the claim "with reasonable diligence" and must "promptly notif[y] the insured of its position once the process is complete." 3 NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION, § 16.03[3][d][i] (2014). A liability insurer that assumes the defense of its insured should promptly advise the insured of any grounds on which it appears that all or any part of that asserted liability might not be covered. *Id.* at § 16.03[3][c][i]. The reservation of rights letter should be "specific and unambiguous," should "fully explain the insurer's position . . . with respect to the coverage issue," and "must avoid any confusion." 22 HOLMES' APPLEMAN ON INSURANCE 2D, § 136.7[B][2] (2003).

Here, after being sued by Alsation in Jackson County Circuit Court, Advantage tendered the lawsuit to its insurer, Mid-Continent. Shortly thereafter, Mid-Continent advised Advantage in a letter dated August 12, 2008, that it would investigate the claim and perform a coverage analysis but that it was reserving its right to assert that there may be no duty to defend or indemnify against the claims. In conclusion, the letter stated that Mid-Continent "will promptly advise you of the outcome of our coverage analysis."[5]

On September 2nd, Mid-Continent sent Advantage a second letter. Most of it was identical to the first letter, with the exception of a few new provisions. It reiterated that Mid-

---

[5]The **August 12, 2008 letter** is set forth in Appendix A.

Continent was reserving its rights and that it would "promptly inform" Advantage if other facts came to light.[6]

Mid-Continent contends that there was no basis for Advantage's bad-faith claim because it properly agreed to defend Advantage, under a "reservation of rights," while it was in the process of investigating the claim and doing a "coverage analysis" and because it was ultimately determined that there was no coverage as to the claim. We disagree.

As explained by our Supreme Court, an insurer "can effect a *proper* reservation of rights" where it provides notice to its insured that its defense of an action "should not be construed as a waiver of any policy defense," and the insured accepts the defense "*with full knowledge of the position of the insurance company*." *Kinnaman-Carson*, 283 S.W.3d at 765 (emphasis added). As stated, however, a "proper" reservation of rights must be both clear and timely, and the insured must fully understand the insurer's position. *See id.; Butters*, 513 S.W.2d at 424-25; *Brooner*, 760 S.W.2d at 447; 3 NEW APPLEMAN, *supra*; 22 HOLMES, *supra*.

Here, both letters only vaguely informed the insured that Mid-Continent would investigate and perform a coverage analysis and that it was reserving its right to assert that there may be no duty to defend or indemnify against the claims.[7] The letters generally discussed the nature of the underlying lawsuit and set forth various provisions of Advantage's general liability policy. Neither letter clearly and unambiguously explained how those provisions were relevant to Advantage's position or how they potentially created coverage issues. The first letter stated that Advantage would be "promptly advised" of the outcome of the "coverage analysis." The

___

[6]The **September 2, 2008 letter** is set forth in Appendix B.

[7]As previously noted in fn. 4, *supra*, there was an unequivocal duty for Mid-Continent to defend the action because of the coverage for interior damage.

8

second letter stated, additionally, that Mid-Continent would conditionally accept the defense of Advantage[8] (while still reserving its rights to contest coverage) and that it had hired an attorney, Eric Swanson, to defend Advantage. It also promised to "promptly" inform Advantage "[i]f other facts come to our attention." Despite not actually analyzing anything or explaining what coverage issues might exist, both letters stated:

> The above analysis constitutes our best efforts to inform you of all factors, which we are currently aware of, that may affect our ultimate responsibility to provide a defense and/or indemnification for damages that may be imposed against you in this litigation.

This did not constitute an effective reservation of rights.

Moreover, Mid-Continent did not "promptly" advise Advantage of its position once it had concluded its coverage analysis. The evidence at trial showed that the day after sending its second letter to Advantage, Mid-Continent determined that "coverage will play a vital aspect of this loss." On September 3, 2008, Mid-Continent concluded that "the only potential coverage with respect to this loss is to the interior of the building" (estimated to be around $50,000). By October 28, 2009, Mid-Continent knew that "the insured was certainly at risk of obtaining a large judgment against them" if Alsation was able to prove its claims. Mid-Continent knew that such a judgment would exceed the limits of Advantage's policy, exposing Advantage to "a very significant, multimillion dollar exposure" with little or no insurance coverage. Despite having promised, in its purported reservation of rights letter, to share its coverage analysis "promptly," Mid-Continent did not inform Advantage of the outcome of its actual coverage analysis until *two years* later, just four days before Advantage's trial.

---

[8]*See* fn. 7, *supra.*

9

Defending an action with knowledge of non-coverage under a policy of liability insurance without a ***proper and effective*** reservation of rights in place will preclude the insurer from later denying liability due to non-coverage. *See Kinnaman-Carson*, 283 S.W.3d at 765 (quoting *Mistele v. Ogle*, 293 S.W.2d 330, 334 (Mo. 1956)); *see also* NEW APPLEMAN ON INSURANCE LAW § 16.03[3][c][v]. Here, Mid-Continent's purported "reservation of rights" notification was not timely or clear, nor did it fully and unambiguously inform the insured of the insurance company's position as to coverage. Thus, regardless of the court's January 2012 declaratory judgment ruling that the policy language did not explicitly cover the claims of Alsation, because Mid-Continent failed to effect a proper reservation of rights, it was prohibited from asserting only limited coverage for the claim. Therefore, Mid-Continent was estopped to deny coverage for the claim to the extent of its policy limits. Consequently, the circuit court did not err in submitting the bad faith claim to the jury despite its declaratory judgment to the effect that the policy language did not expressly provide coverage.

An "insurance company is held to a duty to act in good faith to protect the interests of its insured." *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 67 (Mo. banc 2000). As explained by this court in *Prairie Framing*, "[i]nherent in a policy of insurance is the insurer's obligation to act in good faith regarding settlement of a claim." 162 S.W.3d at 93. A claim for bad-faith failure to settle "is a tort action based on the insurer's failure to protect the interests of its insured." *Shobe v. Kelly*, 279 S.W.3d 203, 212 (Mo. App. 2009). The claim was first recognized in *Zumwalt v. Utilities Insurance Co.*, 228 S.W.2d 750 (Mo. 1950). *Overcast*, 11 S.W.3d at 67. The elements to prove such a claim are:

> (1) the liability insurer has assumed control over negotiation, settlement, and legal proceedings brought against the insured; (2) the insured has demanded that the insurer settle the claim brought against the insured; (3) the insurer refuses to settle

10

the claim within the liability limits of the policy; and (4) in so refusing, the insurer acts in bad faith, rather than negligently.

*Rinehart*, 261 S.W.3d at 595.

Missouri law has held, since *Zumwalt*, that a liability insurer is liable for a judgment against the insured in excess of policy limits if the insurer "is guilty of . . . bad faith in refusing to settle a claim within the limits of the policy." 228 S.W.2d at 753. "While an insurance contract is the basis for the relationship between the insurer and its insured, 'bad faith' liability in handling third-party claims is premised on tort concepts and the extent of the damages is not confined to the liability amount stated in the policy." *Overcast*, 11 S.W.3d at 68. *Overcast* further states:

> The insurance company incurs liability exposure in such "bad faith" claims when the company refuses to settle a claim within the policy limits and the insured is subjected to a judgment in excess of the policy limits as a result of the company's bad faith in disregarding the interests of its insured in hopes of escaping its responsibility under the liability policy.

*Id.* at 67-68.

The *Zumwalt* Court explained that "[b]ad faith is, of course, a state of mind, indicated by acts and circumstances, and is provable by circumstantial as well as direct evidence." 228 S.W.2d at 754. The law requires the insurer to "act honestly to effectually indemnify and save the insured harmless as it has contracted to do" and, thus, "must make whatever payment and settlement an honest judgment and discretion dictate, within the limits of the policy." *Id.* An insurer's "intentional disregard of the financial interest of [its insured] in the hope of escaping the full responsibility imposed upon it by its policy" is evidence of bad faith. *Id.* An insurer cannot protect its own interests to the detriment of its insured's interests; rather, it "must sacrifice its interests" in favor of those of the insured. *Prairie Framing*, 162 S.W.3d at 95.

The circuit court found that Advantage made a submissible case for both bad faith and punitive damages. It noted that Mid-Continent assumed control of the negotiations, settlement, and legal proceedings, and refused to settle for $800,000 after Advantage demanded that it do so. The court held that the jury could find that Mid-Continent acted in bad faith because it refused the settlement demand when it knew that Advantage was exposed to millions of dollars in liability with little or no insurance coverage and did not advise Advantage of this precarious situation until the eve of trial when Advantage could not properly prepare to defend itself.

The circuit court did not err in so finding. Advantage offered substantial evidence on each element of its bad faith claim to make a submissible case. This court in *Shobe* listed the following as examples of bad faith: "failing to fully investigate a [claim], ignoring that a verdict could exceed policy limits, refusing to consider a settlement offer, and not keeping an insured informed of settlement offers or the risks of an excess judgment." 279 S.W.3d at 211. All of those factors are present here. The evidence at trial showed that in September 2008, Mid-Continent accepted the defense of Alsation's lawsuit against Advantage, hired a lawyer to defend the lawsuit, and thereafter assumed control over the negotiation, settlement, and legal proceedings. Mid-Continent controlled the negotiations for nearly two years and participated in mediations during that time. In April 2010, Attorney Swanson informed Mid-Continent that "Alsation will ultimately prevail at trial," and he advised Mid-Continent to settle the claims. Mid-Continent ignored that recommendation and made no settlement offer on Advantage's behalf, even though it knew that Advantage was exposed to millions of dollars in liability. Mid-Continent continued to control the defense of the claim until July 2010, four days before the trial date, when it notified Advantage that it was withdrawing its defense. *See* fn. 4, *supra*.

12

The jury also heard testimony that Advantage demanded that Mid-Continent settle the claim within the limits of its policy but that Mid-Continent failed to do so. Instead, it rejected offers to settle for less than the limits of the policy. The jury heard testimony that the mediation in July 2010 was Advantage's best chance to settle Alsation's claim for less than its full value, yet Mid-Continent gave Attorney Swanson the authority to offer only $50,000 on Advantage's behalf (the maximum amount it believed--but had not yet informed Advantage--that it owed). Mid-Continent refused to make any meaningful offer and was asked to leave the mediation. In addition, the jury heard testimony that Mid-Continent did not respond to a settlement offer after the mediation for less than the policy limits. Although Mid-Continent had concluded in October 2009--nine months before the mediation--that Advantage faced substantial "uncovered exposure" to Alsation, and noted in its internal case file that Advantage should therefore attend mediation, it did not advise Advantage to do so. The foregoing, in addition to the insurer's failure to tell Advantage that it faced substantial uncovered exposure or to share its coverage analysis until four days before the trial date, was sufficient evidence to make a submissible case that Mid-Continent acted in bad faith to preserve its own financial interests at the expense of Advantage's interests. The foregoing demonstrates that there was not "a complete absence of probative fact" to support the jury's finding of bad faith. *See Rinehart*, 261 S.W.3d at 595.

In addition to the evidence showing a failure to *settle* in good faith, the evidence also supports the conclusion that there was an *overall failure to handle the claim in good faith*. Early in the process, Mid-Continent recognized a need to "split the file" (*i.e.*, to have separate adjustors handle the coverage issues and the claim), but it did not do so until two years later, just before the trial.

13

In conclusion, the court did not err in denying Mid-Continent's motion for JNOV in which it claimed that Advantage failed to make a submissible case of bad faith. Points I and III are denied.

In Point II, Mid-Continent argues that the circuit court erred in not applying Oklahoma law to Advantage's bad-faith failure to settle claim. It contends that Oklahoma law would have precluded the bad-faith claim because the court had already found that the claims were not covered by the policy. This point is rendered moot by our holding in Point I, where we determined that Mid-Continent, having failed to provide an effective reservation of rights, was liable on the policy to its policy limits, despite the court's ruling on the policy language, and, thus, the court did not err in submitting the bad-faith claim to the jury.

In Point VII, Mid-Continent argues that the circuit court erred in excluding evidence of the court's declaratory judgment ruling that Alsation's claim was not covered by Advantage's policy. It argues that because the question of its bad faith in failing to settle that claim was a jury issue, its correct belief regarding the lack of coverage was relevant. Mid-Continent makes a similar argument to support Point VIII, in which it claims that the circuit court erred in failing to submit its Instruction E, which informed the jury that Mid-Continent had no duty to indemnify Advantage for Alsation's claim.[9]

---

[9]Mid-Continent's proffered Instruction E stated in pertinent part:

The Court instructs you that it has previously been determined that defendant Mid-Continent Casualty Company is not required under the policy of insurance to pay the Judgment entered in favor of Alsation Land Company, Vallejo, Inc. against plaintiff. Therefore, the Court further instructs you that in your verdict you are not to determine whether the claims asserted against plaintiff by Alsation Land Company, Vallejo, LLC were covered or insured under the policy of insurance issued by defendant Mid-Continent Casualty Company. You are further instructed that in your verdict you are not to determine whether the Judgment obtained against plaintiff by Alsation Land Company, Vallejo, LLC was covered or insured under the policy of insurance issued by defendant Mid-Continent Casualty Company. . . . .

14

We disagree. A decision to exclude evidence is "within the sound discretion of the trial court because it is in a superior position to evaluate the proffered evidence in the context of the trial." *Byers v. Cheng*, 238 S.W.3d 717, 726 (Mo. App. 2007). We review the exclusion of evidence "for abuse of discretion, not whether the evidence was admissible." *Id.* We also review a claim that the circuit court erred in refusing to submit a non-required instruction for an abuse of discretion. *McCullough v. Commerce Bank*, 349 S.W.3d 389, 396 (Mo. App. 2011). We will find an abuse of discretion only when the court's ruling is "clearly against the logic of the circumstances" and "so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 396-97.

At trial, the circuit court allowed Mid-Continent to put on evidence of its belief regarding coverage but prohibited it from introducing the court's subsequent no-coverage ruling. The court also refused to submit Mid-Continent's Instruction E, which would have informed the jury that Mid-Continent was not required under the policy to pay Alsation's claim or the judgment.

The circuit court found that the court's no-coverage ruling was not relevant and, thus, was inadmissible. The court noted that the declaratory judgment ruling with respect to coverage came *after* Mid-Continent refused to settle and Alsation secured the $4,604,000 judgment against Advantage. In other words, Mid-Continent did not know how the court would ultimately rule on the issue of coverage when it refused to settle Alsation's claim against Advantage. The evidence of that coverage ruling, the court explained, would have been unduly misleading and prejudicial because it would have strongly suggested that no coverage existed *prior* to the entry of the Alsation judgment when Mid-Continent is alleged to have acted in bad faith. In reality, however, the court had not ruled on the matter at that time, and, as the court pointed out, Mid-Continent believed that *some coverage* existed prior to the entry of the Alsation judgment.

15

Therefore, the court found that, even if this evidence was logically relevant, it was not legally relevant because the prejudicial effect outweighed the probative value, and the evidence, thus, was inadmissible.

The circuit court was "in a superior position" to weigh the probative value of this evidence against the potential prejudice and juror confusion it may have caused. *See Byers*, 238 S.W.3d at 726. Because the coverage ruling came after Mid-Continent had already refused to settle, the court did not abuse its discretion in excluding evidence of that ruling on the basis that it was irrelevant, confusing, and prejudicial. Nor did the court abuse its discretion in refusing to give Mid-Continent's proffered Instruction E on the same basis. Points VII and VIII are denied.

Further, as previously discussed in Points I and III, the court's declaratory judgment ruling on the policy language was of limited relevance, if any. Mid-Continent had an unequivocal duty to defend based on its own analysis of the policy (interior damage coverage) and, having undertaken that duty, was required to do so in good faith. Moreover, having failed to provide an effective reservation of rights, Mid-Continent was liable on the policy to its policy limits despite the policy language.

Based on the above, we affirm as to Mid-Continent's liability for compensatory damages.

## Damages Issues

We next turn to Mid-Continent's claims relating to the amounts of compensatory and punitive damages awarded to Advantage (Points V, VI, IX, and X). Our resolution of Points V and VI renders the arguments in Points IX and X moot.[10]

---

[10]In Points IX and X, Mid-Continent argues that the circuit court erred in denying Mid-Continent's motions for set-off and for remittitur, respectively. Because we are reversing and remanding for a new trial on the issue of damages, we need not address those arguments. Point IV, which questions the submissibility of the case for punitive damages, also is rendered moot by our resolution of the damages issues. It is addressed *infra*.

16

In Point V, Mid-Continent argues that the circuit court erred in instructing the jury, in Instruction No. 8, that it could award an amount of punitive damages in the first stage of the bifurcated trial. It notes that jury instructions must conform to the law and that section 510.263 requires the jury to determine the amount of punitive damages in the trial's second stage. In Point VI, Mid-Continent contends that the error alleged in Point V was "compounded" by the circuit court's error in submitting the first-stage verdict form because it included no limiting language indicating that the damages award was for *compensatory* damages only.

The issue of whether a jury was properly instructed is a question of law that we review *de novo*. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 90 (Mo. banc 2010). To reverse on the basis of instructional error, "the party challenging the instruction must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction." *Id.* at 90-91. We review the propriety of a verdict form *de novo. See Edgerton v. Morrison*, 280 S.W.3d 62, 65-66 (Mo. banc 2009). A "verdict form, like an instruction, should not misdirect, mislead, or confuse the jury." *Id.* at 67.

The circuit court had granted Mid-Continent's request for a bifurcated trial. Section 510.263 requires the jury, in the first stage of a bifurcated trial, to determine (1) "liability for compensatory damages," (2) "the amount of compensatory damages," and (3) "the liability of a defendant for punitive damages." § 510.263.2. If, in the first stage, the jury finds liability for punitive damages, then the "jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded." § 510.263.3.

Here, contrary to those provisions, the circuit court instructed the jury in the *first stage* of the bifurcated trial, in Instruction No. 8, that it could award an amount of punitive damages. The

17

instruction was patterned after Missouri Approved Jury Instruction ("MAI") 10.01, which is intended for use in a non-bifurcated trial, without any modification for the bifurcation. It stated:

> If you find the issues in favor of plaintiff, and if you believe the conduct of Defendant Mid-Continent Casualty Company as submitted in Instruction Number 6 was outrageous because of Defendant Mid-Continent Casualty Company's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number 7, you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter Defendant Mid-Continent Casualty Company and others from like conduct.

Mid-Continent argues that the instruction should have been modified for the bifurcated trial in the manner suggested by MAI, Illustration 35.19. The Comment to MAI 10.01 directs the reader to Illustration 35.19 "for an example of a submission of punitive damages in a bifurcated trial pursuant to § 510.263." That illustration includes the necessary modification for MAI punitive damages instructions. Based on Illustration 35.19, Instruction No. 8 should have read:

> If you find the issues in favor of plaintiff, and if you believe the conduct of Defendant Mid-Continent Casualty Company as submitted in Instruction Number 6 was outrageous because of Defendant Mid-Continent Casualty Company's evil motive or reckless indifference to the rights of others, *then you may find that Defendant Mid-Continent Casualty Company is liable for punitive damages*.
>
> *If you find that Defendant Mid-Continent Casualty Company is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.*

*See* Illustration 35.19, Instruction No. 13 (emphasis added).

On a Friday, the case was submitted to the jury at the end of the first stage of trial, and the jury returned a verdict in Advantage's favor, assessing $3 million in damages. The verdict form proposed by Advantage and submitted to the jury during the first stage of trial read:

> We, the undersigned jurors, assess the damages of Plaintiff Advantage Buildings & Exteriors, Inc. as follows $_____ (stating the amount).

18

As noted, Mid-Continent contends that the submission of this verdict form compounded the problem created by the unmodified jury instruction in that it, too, should have been modified to conform to Illustration 35.19. Based on Illustration 35.19, the word "compensatory" should have preceded the word "damages" in the first-stage verdict form.

Following receipt of the first-stage verdict, the court told the jury that it would need to return on Monday to consider the amount of punitive damages. The jury had not been informed, prior to that, that there would be a second stage to assess the amount of punitive damages.[11]

When trial resumed on Monday, counsel for Mid-Continent asked the court to re-submit the first stage of the case to the jury with corrected instructions and a corrected verdict form or to have the jury polled as to whether or not their verdict contained any punitive damages. The court denied both requests. It also refused to grant a mistrial. Mid-Continent contends that the court abused its discretion in denying its request to submit a corrected instruction package and verdict form before the second stage began because even though the court knew it had improperly instructed the jury in the first stage, it refused to correct the error.

In the second stage of trial, the court submitted Instruction No. 10, which was nearly identical to Instruction No. 8. It stated:

> In addition to any compensatory damages you assessed in your Verdict, you may assess an additional amount as punitive damages in such sum as you believe will serve to punish Defendant Mid-Continent Casualty Company for the conduct for which you found that Defendant Mid-Continent Casualty Company is liable for punitive damages and will serve to deter Defendant Mid-Continent Casualty Company and others from like conduct.

---

[11]Not only did the instructions fail to inform the jury, but neither the court nor the attorneys (in closing argument) had informed the jury that, if they found *liability* as to punitive damages, then they would need to return for a second phase of trial in order to determine the *amount* of the punitive damages to be awarded.

19

Thus, the jury was instructed in both the first and second stages of trial that it could award an amount of punitive damages to punish and deter Mid-Continent. Following argument by counsel and instruction by the court, the issue of the amount of punitive damages was submitted to the jury. The jury soon returned its second verdict, assessing punitive damages of $2 million.

In its judgment denying Mid-Continent's motion for new trial, the court acknowledged that it "erred in instructing the jury that it could award an amount of punitive damages during the first stage" but concluded that "this error does not require a new trial," citing *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 653-54 (Mo. App. 1997)[12] (holding that the Comments to MAI "are advisory, not mandatory" and denying a claim that the failure to follow the sample instruction in MAI 35.19 constituted prejudicial or reversible error).

We disagree. *Barnett* explained that: "Although the court does not recognize reversible error here, certainly the better practice would be to more fully instruct the jury as to the bifurcated proceedings." *Id.* at 654. (The court also noted that if there had been prejudice in that case, it was corrected by the court's action regarding remittitur. *Id.*) Here, not only would it have been "the better practice" to properly instruct the jury, but instructing the jury that it could award punitive damages in the first stage of the trial was a blatant misstatement of the applicable substantive law. *See, e.g., First Bank v. Fischer & Frichtel, Inc.,* 364 S.W.3d 216, 217-19 (Mo. banc 2012) (affirming grant of new trial where damages instruction did not conform to applicable substantive law).

Rule 70.02(b) permits modification of an MAI instruction if it "must be modified to fairly submit the issues in a particular case." Such a modification, when necessary to make a provided MAI fit the facts of the case, "is not only permissible but is required." MAI, "How To Use This

---

[12]*Overruled on other grounds by Badahman v. Catering St. Louis,* 395 S.W.3d 29, 40 (Mo. banc 2013).

Book," p. LI (7th ed. 2012). As a general rule, the decision to submit a non-mandatory instruction lies within the discretion of the trial court. *See McCullough*, 349 S.W.3d at 396. Various cases have found, however, that the failure to submit a specific modified instruction was reversible error. In *State v. Edwards*, 60 S.W.3d 602, 612 (Mo. App. 2001), where the circuit court failed to modify a self-defense instruction to account for the statutory change for battered woman syndrome, the court stated:

> Where the law has been materially altered by statute following the promulgation of the MAI-CR instruction, the trial court may no longer rely upon the MAI instruction as an accurate statement of the law, and the trial court must modify the MAI instruction to comply with the change in the law.

The court held that the instruction given "did not modify the required mental state to reflect the law related to battered spouse syndrome" and, thus, "did not follow the existing substantive law." *Id.* at 615. The court concluded that the non-modified instruction was confusing and misleading and that the "submission of the instruction was prejudicial and requires reversal." *Id. See also Lowdermilk v. Vescovo Bldg. and Realty Co., Inc.*, 91 S.W.3d 617, 626 (Mo. App. 2002) (court erred in giving a misleading MAI damage instruction as to actual value without modification).

Here, the court acknowledged that it erred in submitting Instruction No. 8 but concluded that there was no prejudice based on *Barnett*, 963 S.W.2d 639. "[T]he party offering the erroneous instruction has the burden of showing that the erroneous instruction 'created no substantial potential for prejudicial effect.'" *Abbott v. Missouri Gas Energy*, 375 S.W.3d 104, 107 (Mo. App. 2012). Here, Advantage offers no argument (apart from also citing *Barnett*, 963 S.W.2d at 653-54) to support its claim "that the trial court's failure to follow the Illustration to MAI 35.19 cannot constitute prejudicial or reversible error." "It is within the province of this court to determine the prejudicial effect of the erroneous instruction." *Abbott*, 375 S.W.3d at

21

107. We conclude that, as in *Edwards*, the failure to give the modified instruction in this case misled and confused the jury and resulted in prejudice to Mid-Continent, warranting reversal.

Because the jury had no idea, at the time of the first verdict, that it would deliberate a second time, the verdict form further misled the jury by not clearly stating that its award must be for "compensatory" damages. The failure to limit the word "damages" in the verdict form, in conjunction with the incorrect submission of the unmodified MAI 10.01 instruction, rendered the verdict form misleading and prejudicial and warrants a new trial as to damages.

We reject Advantage's contention that Mid-Continent failed to preserve this point by failing to object to the instruction and the verdict form on these specific grounds, pursuant to Rule 70.03, which states that "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

During the instruction conference in the first stage, Mid-Continent objected to Instruction No. 8 on grounds that "it is a misstatement of Missouri law," it permitted the giving of an instruction for punitive damages without additional evidence beyond whether the bad faith claim was submissible, and it is misleading and unduly prejudicial. Counsel objected to the first-stage verdict form on the grounds that it was unduly prejudicial, misstates the law, and misleads the jury and directs it toward a verdict allowing punitive damages without a sufficient record.

After the jury returned the first-stage verdict, and before the second stage of trial commenced, Mid-Continent notified the circuit court that it had wrongly instructed the jury that it could award punitive damages in the first stage, failed to instruct the jury about the second stage of trial, and omitted "compensatory" from the verdict form. Mid-Continent asked the court to re-submit the case to the jury with the correct instruction package and verdict form, but the

22

court refused. Mid-Continent asserts that, even if its objections during the first-stage instruction conference were insufficient to preserve its claims on appeal, it nevertheless sufficiently preserved these claims by objecting and identifying the errors that needed correcting before the second stage of trial began. It notes that the purpose of the objection requirement is to allow the trial court to correct the mistake at trial. *See, e.g., Howard v. City of Kansas City*, 332 S.W.3d 772, 790 (Mo. banc 2011) (the purpose of a *timely* objection is to "afford the trial court an opportunity to correct any mistakes immediately and inexpensively").

We agree. The second stage of trial had not yet started when Mid-Continent raised these objections, and nothing prevented the circuit court from taking corrective action while the jury was still present. After a verdict has been received, "[i]f the jury has not yet been discharged, the court may, of course, require the jury to retire again to correct its verdict or find a new one in cases of defects or insufficiency." *Kansas City Power & Light Co. v. Bibb & Assocs., Inc.*, 197 S.W.3d 147, 155 (Mo. App. 2006). "It is such an easy matter," that court explained, "to call the jury's attention to [an] ambiguity in the verdict at the time it is returned, and have it corrected and made absolutely definite and certain before the jury is discharged[.]" *Id.* In *Walton Construction Co. v. MGM Masonry, Inc.*, where there were allegations of an inconsistent verdict, the appellate court noted that the matter "could have been clarified while the case remained in the trial court during the post-trial phase." 199 S.W.3d 799, 805 (Mo. App. 2006). The court stated: "Where there is an inconsistent or ambiguous verdict, the trial judge should attempt to resolve the matter. The trial court can resolve inconsistencies or ambiguities by returning the jury to further deliberations or by polling the jury." *Id.*

This would have been the proper path for the circuit court to have taken in this case. Due to the erroneous instruction and first-stage verdict director, the jury was going to be deliberating

23

as to the same damages in the second stage of trial. This was error, as acknowledged by the circuit court. As this court observed in *Abbott*:

> Identifying instructions "is a very real and vital duty in the administration of justice and no trial judge can abdicate judicial responsibilities to the discretion of the trial lawyers who prepare the instructions. No judge should fail in this duty upon the premise that if the lawyers want to create error they are free to do so."

375 S.W.3d at 111 (quoting MAI, "How To Use This Book," p. LIV). Granting Mid-Continent's request to re-submit the instructions and verdict form to the jury to allow it to deliberate as to only compensatory damages would have corrected the error and should have been granted. In the context of this case, it was reversible error not to do so.

Due to the erroneous jury instructions, and the court's failure to correct those errors, it is impossible to determine which portion of the jury's original damage award was intended as compensatory damages and which (if any) was intended as punitive damages. Consequently, we must reverse and remand for a new trial as to the amount of both compensatory and punitive damages. In addition, because section 510.263 indicates that the jury that determines liability for punitives should *also* determine the amount of punitives, we also reverse as to the liability for punitive damages and remand so that the same jury may determine both the liability for and the amount of punitive damages.

Therefore, Point IV, which asserts that Advantage failed to present sufficient evidence to make a submissible case on punitive damages, is rendered moot.

## Conclusion

Based on the foregoing, we affirm the circuit court's judgment as to Mid-Continent's liability for compensatory damages. We reverse and remand for a retrial on the issue of liability for punitive damages and on the amounts of both compensatory and punitive damages.

/s/JAMES EDWARD WELSH
James Edward Welsh, Judge

All concur.



# MID-CONTINENT

Mid-Continent Casualty Company ▲ Mid-Continent Insurance Company ▲ Oklahoma Surety Company

PO Box 3289   Tulsa, OK 74101-3289   (405) 810-0399   Toll Free (888) 840-3316
FAX (918) 586-0860°   claims@mcg-ins.com

August 12, 2008

Advantage Building and Exteriors, Inc.
8635 West 21st                                    **APPENDIX "A"**
Sand Springs, OK  74063

*CERTIFIED MAIL — RETURN RECEIPT REQUESTED*

RE:  *Claim Number:*      *1540624*
    *Insured:*            *Advantage Building and Exteriors, Inc.*
    *Claimant:*           *State Farm*

Dear Ms Fariss:

Mid-Continent Casualty Company ("Mid-Continent") acknowledges receipt of the above referenced claim. Mid-Continent has initiated an investigation into the circumstances of the above referenced claim and a coverage analysis in an effort to determine the application, if any, of the coverage available under the terms of Advantage Building and Exteriors Inc.'s ("Advantage") policies of insurance with Mid-Continent to this claim.

At this time, in light of the nature of the claims being made against Advantage and the basis for this claim, Mid-Continent is proceeding with its investigation into the circumstances of this matter and the application, if any, of coverage. Mid-Continent wishes to advise you that this investigation and determination of coverage is being conducted pursuant to a non-waiver of Mid-Continent's right to assert that there may be no duty to defend or indemnify all or part of the allegations or damages set forth by the claimants on the grounds set forth herein, or upon such other grounds as may be disclosed by subsequent investigation and discovery. The basis for this reservation of rights follows.

In summary, Advantage is a supplier of cement panels that go together over a metal frame forming a building's exterior. The panels are assembled in Advantage's corporate building in Sands Springs and shipped to various locations. Advantage does not manufacture the cement panels themselves they attach frames to the back of the panels that in turn attach to the steel frames of buildings in various ways designed by engineers. The cement panels are manufactured by The Hardy Company. Advantage has the exterior cement panels powder coated to specifications of colors that are requested. The finished panels are then shipped to where ever requested. The panels are then installed by other contractors and not by Advantage employees or sub-contractors hired by Advantage. In this case Advantage built panels for a State Farm Insurance building located in Vallejo, California. A general contractor in California ordered the panels and Advantage laminated the panels together, built the steel frames, had them powder coated and shipped them to California where they were installed. These panels



a member of GREAT AMERICAN
INSURANCE GROUP

MCC000104

EXHIBIT B

however had a different way of attaching since this area of California is a seismic zone 4. They had to be installed with slip clips. Advantage supplied the general contractor with special instructions for the panels' installation using slip clips. There is a possibility that the panels were not installed with slip clips as specified. Additionally, the sub-contractor used by Advantage to powder coat the panels exterior apparently mixed the powder coating with UV protectorate instead of doing the application as a two step process as required. The result is that the powder coating started failing. Advantage's own employees were sent to California and painted parts of the building using paint bought at Home Depot. Advantage knew before applying the paint that the California EPA did not approve of the paint used due to an ingredient that is banned in the paint. Advantage used the paint anyway believing that because Home Depot sold it in California it was ok to use. The building owner is now stating that the paint applied by Advantage has inconsistent color and finish. The owner also is stating that many of the exterior panels are cracked and failing. The cracks are the full depth of the panels and have telegraphed through the base panel. Additionally, several of the panels have delaminated and pulled away from the building. He reports that Advantage has attempted to fix the delaminated problem by screwing the panels together. The fasteners used by Advantage have not been embedded into the steel framing resulting in an added entry point for water infiltration.

Advantage has policies of insurance with Mid-Continent that provides commercial general liability insurance under policy numbers 04 GL-000570143, policy period 11/25/04 to 11/25/05, 04 GL- 000611414, policy period 11/25/05 to 11/25/06, 04 GL – 000657556, policy period 11/25/06 to 11/25/07 (During this policy period Advantage had a name change to; Advantage Building & Cladding, LLC), and policy 06 GL – 000696740, policy period 11/25/07 to 11/25/08.

Under this coverage, the analysis of the duties to defend and indemnify initiates with the insuring agreement contained within the CG 0001 (10/01) & (12/04), **Commercial General Liability Coverage Form**, which provides coverage for damages because of "**bodily injury**" or "**property damage**" as a result of an "**occurrence**", pursuant to all applicable policy terms, conditions, exclusions, definitions and endorsements.

For a complete reading of the insuring agreements, definitions of terms, exclusions and endorsements embolden in this letter. please refer to the attached appendix.

In summary, the claimants seek to have the panels replaced on the entire building as well as recover damages to the interior. The claimants allege damages because of "**property damage**" as a result of an "**occurrence**" as these terms are defined by the policy.

Even if a claim is made against an insured for "**property damage**" caused by an "**occurrence**", there must be no applicable policy condition, term, exclusion, definition or endorsement that precludes coverage. **Coverage A** has the following exclusions that would further eliminate the potential application of **Coverage A** to this litigation. Your policies provide that the insurance otherwise available under **Coverage A** does not apply to:

MCC000105

a.  **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b.  **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1)     That the insured would have in the absence of the contract or agreement; or

(2)     Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a)     Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b)     Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

j.  **Damage To Property**

"Property damage" to:

(5)     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations, or

(6)     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k  **Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l.  **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor

m.  **Damage To Impaired Property Or Property Not Physically Injured**

MCC000106

941

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.    Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)    "Your product";

(2)    "Your work"; or

(3)    "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

Under **Coverage B**, your policies provide coverage for **Personal And Advertising Injury Liability**. None of the claimants' claims fall within the scope of this coverage.

Your policies have the following language as to **Who Is An Insured**:

**SECTION II – WHO IS AN INSURED**

1.    If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds; but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2.    Each of the following is also an insured:

a.    Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

MCC000107

The policy has the following condition as to an insured's duties in the event of an occurrence, offense, claim or suit:

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.**    *You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:*

**(1)**    *How, when and where the "occurrence" or offense took place;*

**(2)**    *The names and addresses of any injured persons and witnesses; and*

**(3)**    *The nature and location of any injury or damage arising out of the "occurrence" or offense.*

**b.**    *If a claim is made or "suit" is brought against any insured, you must:*

**(1)** *Immediately record the specifics of the claim or "suit" and the date received; and*

**(2)** *Notify us as soon as practicable.*

*You must see to it that we receive written notice of the claim or "suit" as soon as practicable.*

**c.**    *You and any other involved insured must:*

**(1)** *Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";*

**(2)** *Authorize us to obtain records and other information;*

**(3)** *Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and*

**(4)** *Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.*

**d.**    *No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.*

A review of the documents provided to Mid-Continent Casualty indicates that Advantage was aware of this claim in late 2004 or early 2005. Additionally, Advantage incurred the expense of painting the building involved in this matter including labor and material and attempted to make repairs to the panels themselves by attaching fasteners to the panels using Advantage employees and fastening materials.

Please note the following paragraphs found under the form CG 00 01 (10/01) and CG 00 01 (12/04) Titled **COMMERCIAL GENERAL LIABILITY COVERAGE FORM.**

MCC000108

943

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But

   (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance, and

   (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   (2) The "bodily injury" or "property damage" occurs during the policy period, and

   (3) *Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.*

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. *"Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim*

   (1) *Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;*

   (2) *Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage", or*

   (3) *Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.*

The above analysis constitutes our best efforts to inform you of all factors, which we are currently aware of, that may affect our ultimate responsibility to provide a defense and/or indemnification for damages that may be imposed against you in this litigation. If other facts come to our attention, we will promptly inform you of them.

We will promptly advise you of the outcome of our coverage analysis.

Neither this letter nor our continuing investigation and coverage analysis should be construed as a waiver of any right, term or provision under any statute, common law or any policy of insurance issued by Mid-Continent that has not been discussed in this letter. Mid-Continent expressly reserves all such rights.

MCC000109

If you have any questions concerning this correspondence, please do not hesitate to contact the undersigned.

Sincerely,
Mid-Continent Group

Terry Thompson
Senior Claim Adjuster

The Arrow Group
122 S. Main
Broken Arrow, OK. 74012

MCC000110

945

# APPENDIX

## SECTION V – DEFINITIONS

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;
if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Property damage" means.

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**21.** "Your product":

**a.** Means

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by·

    **(a)** You,

    **(b)** Others trading under your name, or

    **(c)** A person or organization whose business or assets you have acquired, and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    **b.** Includes

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product", and

MCC000111

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work".

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

MCC000112



# MID-CONTINENT

Mid-Continent Casualty Company ▲ Mid-Continent Insurance Company ▲ Oklahoma Surety Company

PO Box 3289    Tulsa, OK 74101-3289    (405) 810-0399    Toll Free (888) 840-3318
FAX. (918) 586-0860    claims@mcg-ins com

September 2, 2008

Advantage Building and Exteriors, Inc.                        APPENDIX "B"
8635 West 21st
Sand Springs, OK 74063

### CERTIFIED MAIL – RETURN RECEIPT REQUESTED

RE:   *Claim Number:*        *1540624*
      *Insured:*             *Advantage Building and Exteriors, Inc.*

*Alsation Land company, Vallejo, LLC Plaintiff, v. Walton Construction Company, Inc,*
*Advantage Building and Exteriors, Inc. and USF&G, Defendants. Circuit Court of Jackson*
*County, Missouri Case # 0816-CV22429.*

Dear Ms Fariss:

Mid-Continent Casualty Company ("Mid-Continent") hereby conditionally accepts the defense
of the above referenced litigation. Accordingly, Mid-Continent has referred the defense of
Advantage Building and Exteriors, Inc. (Advantage) to the law firm of Schmitt, Manz and
Swanson 1000 Walnut Suite 800, Kansas City, MO. 64106 telephone 1-816-472-5310 to the
attention of Attorney, Eric Swanson.

In accepting the defense of this matter, Mid-Continent Casualty Company expressly reserves its
right to assert that there may not be a duty to defend or indemnify all or part of the allegations or
damages on the grounds set forth herein, or upon such other grounds as may be disclosed by
subsequent investigation and discovery. The basis for this reservation of rights follows.

In summary, Advantage is a supplier of cement panels that connect together over a metal frame
forming a building's exterior. The panels are laminated together as ordered and assembled in
Advantage's corporate building in Sands Springs. They are then shipped to various locations.
Advantage does not manufacture the cement panels themselves; they attach frames to the back
of the panels that in turn attach to the steel frames of buildings in various ways designed by
engineers. The cement panels are manufactured by The Hardy Company. Advantage has the
exterior cement panels powder coated to specifications of colors that are requested. The finished
panels are then shipped to where ever requested. The panels are installed by other contractors
not by Advantage employees or sub-contractors hired by Advantage. In this case Advantage
built panels for a State Farm Insurance building located in Vallejo, California. The building
project started on July 1, 2004 and finished September 30, 2004 according to the insured's
Warranty information. Walton Construction, Inc., the general contractor out of Missouri,
ordered the panels from Advantage. Advantage laminated the panels together, built the steel



a member of **GREAT AMERICAN**
INSURANCE GROUP

MCC000344

EXHIBIT C

951

frames, had them powder coated and shipped them to California where they were installed. These panels however had a different way of attaching since this area of California is a seismic zone 4. They had to be installed with slip clips. Advantage supplied the general contractor with special instructions for the panels' installation using slip clips. There is a possibility that the panels were not installed with slip clips as specified. Additionally, the sub-contractor used by Advantage to powder coat the panels exterior apparently mixed the powder coating with UV protectorate instead of doing the application as a two step process as required. The result is that the powder coating started failing. Advantage's own employees were sent to California and painted parts of the building using paint bought at Home Depot. Advantage knew before applying the paint that the California EPA did not approve of the paint used due to an ingredient that is banned in the paint. Advantage used the paint anyway believing that because Home Depot sold it in California it was ok to use. The building owner is now stating that the paint applied by Advantage has inconsistent color and finish. The owner also is stating that many of the exterior panels are cracked and failing. The cracks are the full depth of the panels and have telegraphed through the base panel. Additionally, several of the panels have delaminated and pulled away from the building. He reports that Advantage has attempted to fix the delaminating problem by screwing the panels together. The fasteners used by Advantage have not been embedded into the steel framing resulting in an added entry point for water infiltration.

The Plaintiffs' causes of action against Advantage are:

1. Breach of Warranty
2. Negligence
3. Property Damage

The Plaintiff's causes of action for 1. Breach of Warranty does not appear to constitute a claim for damages because of "bodily injury" or "property damage" as a result of an "occurrence" as these terms are defined by the policy. Further they may be considered to be intentional acts that would not be covered.

Advantage has policies of insurance with Mid-Continent that provides commercial general liability insurance under policy numbers 04 GL-000528668 effective dates 11/25/03 to 11/25/04, 04 GL-000570143, policy period 11/25/04 to 11/25/05, 04 GL-000611414, policy period 11/25/05 to 11/25/06, 04 GL – 000657556, policy period 11/25/06 to 11/25/07 (During this policy period Advantage had a name change to; Advantage Building & Cladding, LLC), and policy 06 GL – 000696740, policy period 11/25/07 to 11/25/08.

Under this coverage, the analysis of the duties to defend and indemnify initiates with the insuring agreement contained within the CG 0001 (10/01) & (12/04), **Commercial General Liability Coverage Form**, which provides coverage for damages because of "**bodily injury**" or "**property damage**" as a result of an "occurrence", pursuant to all applicable policy terms, conditions, exclusions, definitions and endorsements.

For a complete reading of the insuring agreements, definitions of terms, exclusions and endorsements embolden in this letter, please refer to the attached appendix.

MCC000345

In summary, the claimants seek to have the panels repaired or replaced on the entire building as well as recover damages to the interior. The claimants allege damages because of "property damage" as a result of an "occurrence" as these terms are defined by the policy.

Even if a claim is made against an insured for "property damage" caused by an "occurrence", there must be no applicable policy condition, term, exclusion, definition or endorsement that precludes coverage. **Coverage A** has the following exclusions that would further eliminate the potential application of **Coverage A** to this litigation. Your policies provide that the insurance otherwise available under **Coverage A** does not apply to:

a. *Expected Or Intended Injury*

*"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.*

b. *Contractual Liability*

*"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:*

*(1) That the insured would have in the absence of the contract or agreement; or*

*(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:*

*(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract", and*

*(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.*

j. *Damage To Property*

*"Property damage" to:*

*(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations, or*

*(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it*

*Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".*

k. *Damage to Your Product*

*"Property damage" to "your product" arising out of it or any part of it.*

MCC000346

**l.** **Damage to Your Work**

*"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".*

*This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.*

**m.** **Damage To Impaired Property Or Property Not Physically Injured**

*"Property damage" to "impaired property" or property that has not been physically injured, arising out of:*

*(1)     A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or*

*(2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.*

*This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.*

**n.** **Recall Of Products, Work Or Impaired Property**

*Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of*

*(1)     "Your product";*

*(2)     "Your work"; or*

*(3)     "Impaired property",*

*if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.*

Under **Coverage B,** your policies provide coverage for **Personal And Advertising Injury Liability**   None of the claimants' claims fall within the scope of this coverage

Your policies have the following language as to **Who Is An Insured:**

### SECTION II – WHO IS AN INSURED

1.     *If you are designated in the Declarations as:*

*a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.*

*b. A partnership or joint venture, you are an insured  Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.*

*c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.*

*d. An organization other than a partnership, joint venture or limited liability company, you are an insured  Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.*

MCC000347

954

**e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**2.** Each of the following is also an insured:

  **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

The policy has the following condition as to an insured's duties in the event of an occurrence, offense, claim or suit:

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

**2.** *Duties In The Event Of Occurrence, Offense, Claim Or Suit*

 **a.** *You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:*

  *(1) How, when and where the "occurrence" or offense took place;*

  *(2) The names and addresses of any injured persons and witnesses; and*

  *(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.*

 **b.** *If a claim is made or "suit" is brought against any insured, you must:*

  *(1) Immediately record the specifics of the claim or "suit" and the date received; and*

  *(2) Notify us as soon as practicable.*

  *You must see to it that we receive written notice of the claim or "suit" as soon as practicable.*

 **c.** *You and any other involved insured must:*

  *(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";*

  *(2) Authorize us to obtain records and other information;*

  *(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and*

  *(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.*

 **d.** <u>*No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.*</u>

A review of the documents provided to Mid-Continent Casualty indicates that Advantage was aware of this claim in late 2004 or early 2005. Additionally, Advantage incurred the expense of painting the building involved in this matter including labor and material and attempted to make repairs to the panels themselves by attaching fasteners to the panels using Advantage employees and fastening materials.

MCC000348

Please note the following paragraphs found under the form CG 00 01 (10/01) and CG 00 01 (12/04) Titled **COMMERCIAL GENERAL LIABILITY COVERAGE FORM.**

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies We will have the right and duty to defend the insured against any "suit" seeking those damages However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result But:

   (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance, and .

   (2) . . Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   · No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. <u>This insurance applies to "bodily injury" and "property damage" only if:</u>

   (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory".

   (2) The "bodily injury" or "property damage" occurs during the policy period, and

   (3) *Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period*

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period

   d. *"Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim*

   (1) *Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;*

   (2) *Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage", or*

   (3) *Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur*

The Plaintiffs are praying for an amount unspecified within the Petition. Advantage Building and Exterior Construction Inc.'s limit of coverage is $1,000,000. Due to the fact that the Plaintiffs are unspecific in their demand amount, and that there are questions of coverages applicable to the loss as a whole, Mid-Continent Casualty Co. is advising Advantage Building and Exteriors, Inc. that they may, at their own expense, retain an attorney of their own choosing to protect Advantage Building and Exteriors, Inc's interests.

It is not the intent of this letter to advise you that you must retain such attorneys, but merely to point out to you your rights.

MCC000349

The above analysis constitutes our best efforts to inform you of all factors, which we are currently aware of, that may affect our ultimate responsibility to provide a defense and/or indemnification for damages that may be imposed against you in this litigation. If other facts come to our attention, we will promptly inform you of them.

Neither this letter nor our continuing investigation, coverage analysis or defense of this law suit under reservation, should be construed as a waiver of any right, term or provision under any statute, common law or any policy of insurance issued by Mid-Continent that has not been discussed in this letter. Mid-Continent expressly reserves all such rights. .

If you have any questions concerning this correspondence, please do not hesitate to contact the undersigned.

Sincerely,
Mid-Continent Group

Terry Thompson.
Senior Claim Adjuster .

The Arrow Group
122 S. Main
Broken Arrow, OK. 74012

Attorney, Eric Swanson
Schmitt, Manz and Swanson
1000 Walnut Suite 800,
Kansas City, MO. 64106.

MCC000350

# APPENDIX

## SECTION V – DEFINITIONS

8.  "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because·

    a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient inadequate or dangerous; or

    b.  You have failed to fulfill the terms of a contract or agreement,

       if such property can be restored to use by.

    a.  The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b.  Your fulfilling the terms of the contract or agreement.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Property damage" means:

    a.  Physical injury to tangible property, including all resulting loss of use of that property All such loss of use shall be deemed to occur at the time of the physical injury that caused it, or

    b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

21. "Your product"

    a.  Means·

    (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by.

        (a) You;

        (b) Others trading under your name, or

        (c) A person or organization whose business or assets you have acquired; and

    (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

        b.  Includes

        (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

MCC000351

(2) The providing of or failure to provide warnings or instructions.

    c.    Does not include vending machines or other property rented to or located for the use of others but not sold.

22.    "Your work":

    a.    Means:

        (1)    Work or operations performed by you or on your behalf; and

        (2)    Materials, parts or equipment furnished in connection with such work or operations

    b.    Includes

        (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        (2)    The providing of or failure to provide warnings or instructions.

MCC000352

# OKLAHOMA STATUTE §23-9.1.

§23-9.1.

A. In an action for the breach of an obligation not arising from contract, the jury, in addition to actual damages, may, subject to the provisions and limitations in subsections B, C and D of this section, give damages for the sake of example and by way of punishing the defendant based upon the following factors: the seriousness of the hazard to the public arising from the defendant's misconduct; the profitability of the misconduct to the defendant; the duration of the misconduct and any concealment of it; the degree of the defendant's awareness of the hazard and of its excessiveness; the attitude and conduct of the defendant upon discovery of the misconduct or hazard; in the case of a defendant which is a corporation or other entity, the number and level of employees involved in causing or concealing the misconduct; and the financial condition of the defendant.

B. Category I. Where the jury finds by clear and convincing evidence that the defendant has been guilty of reckless disregard for the rights of others, or an insurer has recklessly disregarded its duty to deal fairly and act in good faith with its insured, the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in an amount not to exceed the greater of:

1. One Hundred Thousand Dollars ($100,000.00); or

2. The amount of the actual damages awarded.

C. Category II. Where the jury finds by clear and convincing evidence that:

1. The defendant has acted intentionally and with malice towards others; or

2. An insurer has intentionally and with malice breached its duty to deal fairly and act in good faith with its insured,

the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in an amount not to exceed the greatest of:

a. Five Hundred Thousand Dollars ($500,000.00),

b. twice the amount of actual damages awarded, or

c. the increased financial benefit derived by the defendant or insurer as a direct result of the conduct causing the injury to the plaintiff and other persons or entities.

The trial court shall reduce any award for punitive damages awarded pursuant to the provisions of subparagraph c of this paragraph by the amount it finds the defendant or insurer has previously paid as a result of all punitive damage verdicts entered in any court of the

**EXHIBIT D**



Electronically Filed - WESTERN DISTRICT CT OF APPEALS - December 23, 2013 - 12:02 PM

State of Oklahoma for the same conduct by the defendant or insurer.

D. Category III. Where the jury finds by clear and convincing evidence that:

1. The defendant has acted intentionally and with malice towards others; or

2. An insurer has intentionally and with malice breached its duty to deal fairly and act in good faith with its insured, and the court finds, on the record and out of the presence of the jury, that there is evidence beyond a reasonable doubt that the defendant or insurer acted intentionally and with malice and engaged in conduct life-threatening to humans,

the jury, in a separate proceeding conducted after the jury has made such finding and awarded actual damages, may award exemplary damages in any amount the jury deems appropriate, without regard to the limitations set forth in subsections B and C of this section.

E. In determining the amount, if any, of exemplary damages to be awarded under either subsection B, C or D of this section, the jury shall make the award based upon the factors set forth in subsection A of this section.

F. The provisions of this section are severable, and if any part or provision thereof shall be held void, the decision of the court shall not affect or impair any of the remaining parts or provisions thereof.

G. This section shall apply to all civil actions filed after the effective date of this act.