**J.M. NEIL & ASSOCIATES, INC., Appellant,**

v.

**ALEXANDER ROBERT WILLIAM, INC., et al., Respondents.**

No. WD 73488.

Missouri Court of Appeals, Western District.

Jan. 10, 2012.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 2012.

Stacey A. Campbell, for Appellant.

Russell M. Nasteff, for Respondents.

Before Division Four: THOMAS H. NEWTON, Presiding Judge, JOSEPH M. ELLIS, Judge and CYNTHIA SUTER, Special Judge.

JOSEPH M. ELLIS, Judge.

J.M. Neil & Associates, Inc. appeals from a judgment of the Circuit Court of Jackson County granting Alexander Robert William, Inc. and Nash Resources, Inc.'s motion for judgment notwithstanding the verdict on the issue of punitive damages. For the following reasons, the judgment is reversed, and the case is remanded with instruction to enter a judgment consistent with this opinion.

J.M. Neil & Associates, Inc. ("JMN") is a certified, woman-owned, staffing company. Alexander Robert William, Inc. ("ARW") is a certified, service disabled, veteran-owned small business. In 2005, JMN and ARW entered into a teaming agreement in hopes of being awarded a veteran set-aside General Services Administration contract ("the GSA contract"). Under the agreement, ARW would be the prime contractor on the GSA contract, and JMN would serve as a subcontractor to ARW. The agreement further specified that ARW would employ four of the contract associates hired to work on the GSA contract while JMN would employ two of the contract associates hired to work on the GSA contract. The teaming agreement also included a non-compete agreement, which acknowledged that the two JMN employees working on the GSA contract would move to ARW for the duration of the contract and prohibited ARW from attempting to coerce or influence JMN employees to remain with ARW upon termination of the GSA contract.

ARW was awarded the GSA contract, and JMN provided ARW with two contract associates. In 2008, however, problems arose between JMN and ARW. On January 20, 2009, ARW's owner, Martin Smith, sent a letter to JMN notifying JMN that ARW was terminating the teaming agreement. The letter attributed the termination of the agreement to JMN's alleged poor performance under the contract. On February 4, 2009, Smith sent another letter informing JMN that the termination of the teaming agreement would be effective as of Friday, February 20, 2009, at the close of business.

On the termination date of the teaming agreement, John Haylock was the only JMN employee working for ARW on the GSA contract. Smith realized that the teaming agreement prohibited him from hiring Haylock to continue working on the GSA contract, or even trying to influence Haylock do so. Nevertheless, on the termination date, Friday, February 20, 2009, Smith informed Haylock that if he wanted to continue working on the GSA contract, he would need to secure employment with another staffing company, and gave Haylock a list containing the names and numbers of four staffing companies that Haylock should contact. Nash Resources, Inc.

("NRI"), a staffing company owned by Smith's mother, Mary Lou Nash, was one of the companies on that list.

On the following day, Saturday, February 21, 2009, Haylock called Nash, who was in the NRI office that Saturday to take Haylock's phone call. She hired him over the telephone and told Haylock she would "work out a deal" with Smith on Monday for him to return to work on the GSA contract. On Monday, February 23, 2009, Haylock, as an NRI employee, returned to work on ARW's GSA contract, performing the same job at the exact same pay rate.

In February of 2009, JMN filed suit seeking to enjoin ARW from terminating the teaming agreement and to recover damages for the alleged breach of contract. On May 23, 2009, JMN amended its petition to include three counts: (1) a breach of contract claim against ARW and Smith; (2) a tortious interference claim against NRI and Nash; and (3) a conspiracy to breach and interfere with a contract claim against ARW, NRI, Smith, and Nash. A jury trial was held in July, 2010, and the jury found in favor of JMN on all counts, awarding $45,000, $22,695.45, and $43,693.12 in compensatory damages on the three counts, respectively. The jury also awarded $170,000 in punitive damages against ARW and NRI with regard to the conspiracy count.

On September 10, 2010, ARW and NRI ("Respondents") filed a motion for judgment notwithstanding the verdict ("JNOV"), asserting, in pertinent part, that JMN failed to adduce competent evidence upon which the jury could have found that punitive damages were appropriate. On November 24, 2010, the trial court issued a judgment granting Respondents' JNOV on the issue of punitive damages, concluding that the evidence failed "to prove outrageous or evil behavior based upon a standard of clear and convincing evidence."[1] JMN timely filed its notice of appeal to this court.

In its sole point on appeal, JMN asserts that the trial court erred in granting Respondents' JNOV motion on the issue of punitive damages because JMN made a submissible case for punitive damages in that it provided clear and convincing evidence of Respondents' evil motive and reckless disregard for JMN's rights. We agree.

"Essentially, a JNOV motion is a challenge to the submissibility of the case." *Koppe v. Campbell*, 318 S.W.3d 233, 239 (Mo.App. W.D.2010) (internal quotation omitted). "We review a trial court's grant of a motion for JNOV *de novo* and must determine whether the plaintiff made a submissible case." *Id.* "To make a submissible case, a plaintiff must present substantial evidence that tends to prove the

---

1. Respondents' JNOV motion also asserted the following: (1) JMN failed to adduce competent evidence upon which the jury could have found that ARW breached its contract with JMN; (2) JMN failed to adduce competent evidence upon which the jury could have found that NRI tortiously interfered with JMN's contract with ARW; (3) JMN failed to adduce competent evidence upon which the jury could have found that Respondents conspired to breach and tortiously interfere with JMN's contract with ARW; and (4) the damages awarded had no rational relationship to any alleged harm and thereby could not be properly awarded. At a hearing on the JNOV motion, the parties agreed that the jury awards as to the three counts were duplicative and constituted one unit of recovery. The court likewise determined that $43,693.12 was the total amount of compensatory damages that JMN incurred and proved. Accordingly, without objection from JMN, the trial court remitted the jury's verdict and entered a judgment against both Respondents in the amount of $43,693.12. The trial court denied Respondents' JNOV motion with respect to the remaining claims.

facts essential to plaintiff's recovery." *Id.* "Substantial evidence is competent evidence from which the trier of fact can reasonably decide the case." *Livingston v. Baxter Health Care Corp.*, 313 S.W.3d 717, 724 (Mo.App. W.D.2010) (internal quotation omitted). Thus, our review of this case is limited to "whether or not, as a matter of law, the plaintiff presented enough evidence to submit his claim of punitive damages to the jury." *Horizon Memorial Grp., L.L.C. v. Bailey*, 280 S.W.3d 657, 661 (Mo.App. W.D.2009).

"[W]e review the evidence and all reasonable inferences that can be drawn from that evidence in a light most favorable to the verdict, and we disregard all contrary evidence and inferences." *Id.* "There is a presumption favoring the reversal of a [JNOV]." *Laws v. St. Luke's Hosp.*, 218 S.W.3d 461, 466 (Mo.App. W.D.2007). Such presumption will not be overcome unless "the evidence and inferences favorable to the plaintiff leave no room for reasonable minds to conclude that [the plaintiff] made a submissible case." *Horizon Memorial Grp.*, 280 S.W.3d at 662.

◼ To make a submissible case for punitive damages, there must be "clear and convincing proof of [a defendant's] culpable mental state." *Drury v. Mo. Youth Soccer Ass'n*, 259 S.W.3d 558, 573 (Mo.App. E.D.2008). Thus, "a plaintiff makes a submissible case for punitive damages when he presents clear and convincing evidence from which a reasonable jury could conclude that the defendant had an evil motive." *Horizon Memorial Grp.*, 280 S.W.3d at 663.

◼ A plaintiff establishes a defendant's culpable mental state "by showing either that the defendant committed an intentional wanton, willful, and outrageous act without justification *or acted with reckless disregard for the [plaintiff's] rights and interest.*" *Id.* (emphasis added).

Thus, a jury can infer the defendant's evil motive when the defendant recklessly disregards the interests and rights of the plaintiff. *Drury*, 259 S.W.3d at 573. Likewise, " '[i]f a defendant intentionally does a wrongful act, and knows at the time the act is wrongful, it is done wantonly and with a bad motive.' " *Claus v. Intrigue Hotels, LLC*, 328 S.W.3d 777, 783 (Mo.App. W.D.2010) (quoting *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 870 (Mo.App. E.D.2009)).

◼ Viewed in the light most favorable to the jury's verdict, JMN presented clear and convincing evidence from which the jury could have concluded that Respondents acted with reckless disregard for JMN's rights and interests and thereby possessed the requisite evil motive for purposes of punitive damages. JMN adduced evidence at trial that Nash accompanied Smith to a meeting held at GSA's office that was attended by all employees working on ARW's GSA contract. At the conclusion of that meeting, Nash encouraged Smith to terminate the teaming agreement with JMN and told him to give JMN 30–days notice of the termination of the agreement.

Shortly after deciding to terminate the teaming agreement, Smith spoke with Paul Guastello, ARW's former Vice President and Contracts Manager, about keeping Haylock working on ARW's GSA contract. During that conversation, Guastello warned Smith to be careful of the non-compete agreement and the potential litigation that could result if Haylock continued to work on ARW's GSA contract. The non-compete provisions prohibited ARW from hiring or attempting to influence JMN employees to remain with ARW when JMN's work on the GSA contract ended. Despite the clear prohibition on hiring or influencing JMN personnel to

remain with ARW and the warning from Guastello regarding the non-compete agreement, Smith told Haylock he could continue working on the GSA contract, but that he would have to be employed by another staffing company. On the date the teaming agreement terminated, Friday, February 20, 2009, Smith provided Haylock with a list containing the names and numbers of four staffing companies that Haylock should call for employment. One of those companies was NRI, a staffing agency owned by Mary Lou Nash, Smith's mother.

On the following day, Saturday, February 21, 2009, Haylock called Nash, who was in the NRI office that Saturday to take Haylock's phone call. She hired him over the telephone and told Haylock she would "work out a deal" with Smith on Monday for him to return to work on the GSA contract.

Nash's own testimony indicates that prior to receiving that phone call from Haylock, Smith had called and informed her Haylock could not continue to work on ARW's GSA contract unless Haylock found employment with one of the four staffing agencies that Smith had given him to call. This evidence establishes that Nash had knowledge of ARW's non-compete agreement with JMN and knew Haylock had been provided with a list of staffing agencies, one of which was her own company, before she ever spoke with Haylock. The evidence further permits a reasonable inference that Smith and Nash conspired to hire Haylock away from JMN so that he could continue to work on ARW's GSA contract in violation of the non-compete provisions of the teaming agreement.

The evidence further establishes that when Nash received Haylock's phone call that Saturday, she hired him immediately over the phone. She then told Haylock to report to work on the GSA contract on Monday, February 23, 2009, as usual. That Monday, Haylock returned to work on ARW's GSA contract as an NRI employee, performing the same job as when he was a JMN employee at the exact same pay rate. Additional evidence was presented at trial regarding the extensive background checks that have to be completed before an employee receives security clearance to work on a GSA contract. Such background checks take several months to complete and recent changes to the background check procedures have made the process even longer. Thus, the evidence establishes that because Haylock worked until the end of the workday on Friday, was hired by NRI on Saturday, and returned to work on ARW's GSA contract on Monday, ARW avoided having to find a replacement employee, who would not receive security clearance to work on the contract until several months later.

Thus, there was clear and convincing evidence that both Smith and Nash possessed knowledge of ARW's non-compete agreement with JMN and understood the consequences of Haylock being unavailable to work on ARW's GSA contract once the teaming agreement with JMN was terminated. The evidence likewise clearly established that despite such knowledge and Guastello's warnings about JMN's rights and interests under that non-compete agreement, Nash and Smith conspired to keep Haylock working on ARW's GSA contract to avoid the hassle of finding another employee and having to wait several months for that employee's background check to be processed. This evidence is clear and convincing proof that Respondents conspired to breach the teaming agreement's non-compete clause by working together to influence Haylock to leave JMN and continue working on ARW's GSA contract by becoming an NRI employee. As such, it established an inten-

tional wrongful act by ARW and NRI, who both knew their actions were wrongful at the time. Moreover, it is likewise clear and convincing proof that ARW and NRI recklessly disregarded JMN's rights and interests. As such, JMN made a submissible case for punitive damages, and the trial court erred in granting JNOV.

The trial court's entry of judgment notwithstanding the verdict on the issue of punitive damages is reversed, and the case is remanded with instructions to reinstate the jury's verdict on that issue and otherwise enter judgment consistent with this opinion.

All concur.