VICTOR C. HOWARD, JUDGE
*553 David Jungerman appeals the judgment of the trial court awarding Jeffery Harris $750,000 in compensatory damages and $5 million in punitive damages on Harris's claim against him for battery. The judgment is affirmed.
Factual Background[1]
This appeal arises out of a shooting in the early morning hours of September 25, 2012, at a building owned by Jungerman located at 131 South Belmont Avenue in Kansas City. The building was a 20,000-square-foot vacant warehouse with a loading dock. A chain-link fence surrounded the building and dock.
Harris was living on the streets in the Northeast part of Kansas City at the time. That night, the weather was overcast and looking like rain, so Harris was looking for shelter and a place to sleep. He rode his bicycle to the back of the building, which he assumed was abandoned. He saw that the fence was "kind of tilted" and loose, and he rolled his bike over it through a hole, which he did not make. He walked up onto the dock and found a man, who he later learned was Robert Wallace, standing on the dock.
Wallace, who had also been riding his bike in the area, had heard a loud, banging noise coming from the building, which he had also assumed was abandoned. He walked up onto the dock to investigate but by then the banging had stopped. Wallace saw the overhead door from the building to the dock was halfway open. Thinking that that was unusual, he yelled into the building "who's in there" or "hello."
By then, Harris walked up onto the dock and asked Wallace if he could sleep under a trailer beside the dock. As the two men were talking, they heard gunshots. Harris was shot in the back of the right leg, fell to the ground, and tried to crawl away. Wallace started running away from the dock and was shot in the buttocks. On the ground, Harris saw that his leg was bleeding badly, cut a rope off a pouch he was carrying, and tied his leg off to stop the bleeding. Just then, Jungerman struck Harris in the head with an AK-47 rifle. Jungerman said, "[W]here they at? You MF-er. I'll kill you right here." Harris responded, "F* * * you, you just shot my leg off," and Jungerman "took off running." Harris testified that he never moved toward or threatened Jungerman and didn't even know Jungerman was there before Jungerman shot him. Wallace also testified that neither he nor Harris attacked Jungerman but instead that the shooting was unprovoked and "came out of nowhere."
Harris was found on the ground next to the dock and transported to the hospital. Because of the extent of nerve and vascular injury, surgeons amputated Harris's *554 right leg below the knee. Afterward, he experienced further complications from the injury including four additional surgeries over the next three months for blood collection and infection in the wound and extended hospitalizations.
Harris's medical expenses totaled $226,000, and an orthopedic surgeon testifying as his expert opined that those expenses were reasonable and necessary. A certified nurse life care planner estimated Harris's future medical costs to be $772,425, which the expert also found reasonable.
Police arrived at the scene and found blood spatter and bone fragments just outside the dock door and a pool of blood on the ground east of the loading dock. Five shell casings were found in the same area in the corner of a large room of the building near the open door. No blood or bone fragments were found in the building.
Harris filed a petition for damages against Jungerman and two corporations of which he alleged Jungerman was the owner or sole shareholder. His petition raised claims of negligence, battery, and assault against the three defendants. It also included a separate count for punitive damages.
In his answer, Jungerman asserted, as affirmative defenses, that the petition failed to state a claim for which relief can be granted and that he "was justified in using deadly force against Plaintiff and that such justification is an absolute defense to Plaintiff's claims." He also claimed that Count IV asserted an independent cause of action for punitive damages and, therefore, failed to state a claim for which relief can be granted.
Harris eventually voluntarily dismissed one of Jungerman's corporations as a party. No summons was ever issued for the second corporation, and no attorney entered an appearance for it. Harris also voluntarily dismissed his negligence claim.
Jungerman requested a bifurcated trial on the issue of punitive damages under section 510.263,[2] which the trial court granted. Jungerman dismissed his attorneys and continued pro se. He eventually hired another attorney to enter a limited appearance to assist him as co-counsel while remaining pro se. That arrangement continued through trial.
At trial, Jungerman testified that he got a call from his alarm company around 2:20 a.m. that the silent, motion detection alarm at the building had been activated. He took a flashlight, a loaded AK-47, and a loaded .38 Smith & Wesson pistol and drove to the building. He said that Harris and Wallace were both inside the building and that he intentionally shot at them because they were charging at him and he was defending himself. Leo Wynne, who had worked for Jungerman for more than 30 years, testified that he found blood drops, bone fragments, and dried blood inside the building by the door to the dock the next day. Jungerman did not report any of these findings to police.
During the first phase of the trial, Harris only submitted the battery claim to the jury, abandoning the assault claim. The jury found in favor of Harris, assessed compensatory damages at $750,000, and found that Jungerman was liable for punitive damages. During the second phase of the trial, the jury awarded Harris $5 million in punitive damages. The trial court accepted the verdicts and entered judgment accordingly. This appeal by Jungerman followed.
Punitive Damages
Jungerman raises two points on appeal regarding punitive damages. In his *555 first point, Jungerman asserts that the trial court erred in awarding punitive damages because Harris's petition did not plead any claim for punitive damages as to battery. He argues that his only claim for punitive damages was alleged in a separate count after his claim for assault, which was abandoned at trial, and the only actions alleged to warrant punitive damages in the separate count went to negligence, a count Harris dismissed before trial.
A claim that the petition fails to state a claim upon which relief can be granted is solely a test of the adequacy of the plaintiff's petition. City of Greenwood v. Martin Marietta Materials, Inc. , 299 S.W.3d 606, 626-27 (Mo. App. W.D. 2009). The petition is reviewed in an almost academic manner, assuming all of plaintiff's averments are true and liberally granting to plaintiff all reasonable inferences therefrom. Id.
A claim for punitive damages is not an independent cause of action; rather it is incidental to the underlying cause of action. Amesquita v. Gilster-Mary Lee Corp. , 408 S.W.3d 293, 305 (Mo. App. E.D. 2013). Rule 55.19 provides, "When items of special damages are claimed, they shall be specifically stated. In actions where exemplary or punitive damages are recoverable, the petition shall state separately the amount of such damages sought to be recovered." Punitive damages must be pleaded and proven. Rock Port Mkt., Inc. v. Affiliated Foods Midwest Coop., Inc. , 532 S.W.3d 180, 187 (Mo. App. W.D. 2017). In the case of an intentional tort, conduct that is outrageous because of the defendant's evil motive or reckless indifference to the rights of others warrants punitive damages. Burnett v. Griffith , 769 S.W.2d 780, 787 (Mo. banc 1989). Evil motive may be inferred when the defendant recklessly disregards the interests and rights of the plaintiff. Id. ; J.M. Neil & Assocs., Inc. v. Alexander Robert William, Inc. , 362 S.W.3d 21, 24 (Mo. App. W.D. 2012).
Under Count II for battery, Harris's petition alleged that Jungerman "intentionally, harmfully and offensively contacted Plaintiff shooting him in the leg and then striking him in the face with the barrel of his assault rifle." In Count IV for punitive damages, the petition incorporated by reference all of the preceding allegations of the petition including those allegations under the battery claim. It then alleged:
Defendant Jungerman's actions manifest reckless indifference to the rights of Plaintiff. Defendant Jungerman knew or should have had information from [sic] which he in the exercise of ordinary care, should have known that the alleged negligent conduct created a high degree of probability of injury and thereby showed complete [sic] indifference or conscious disregard for Plaintiff's safety.
While the second sentence of the punitive damages allegation related to the negligence claim, the first sentence was applicable to the intentional tort claims. Liberally granting Harris all favorable inferences from his pleading, the petition sufficiently asserted that the wrongful acts alleged in the battery claim were done with a reckless indifference to the rights of Harris. The petition gave Jungerman fair notice of the nature of the demand for punitive damages and the grounds upon which it rested. Harris's petition sufficiently alleged a cause of action for punitive damages for battery. The point is denied.
In Jungerman's fourth point on appeal, he claims that the trial court plainly erred in submitting Instruction No. 12 during the first phase of the bifurcated trial. Instruction No. 12 read:
If you find the issues in favor of plaintiff, and if you believe the conduct of the *556 defendant as submitted in Instruction Number 7 was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number 11 you may award plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct .
You may consider harm to others in determining whether defendant's conduct was outrageous. However, in determining the amount of any punitive-damage award, you must not include damages for harm to others who are not parties to this case.
If you find that defendant is liable for punitive damages in this stage of trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.
(emphasis added). He claims that the emphasized part of the instruction led the jury to believe that it could award an amount of punitive damages in the first stage of the trial in violation of 510.263 and MAI 10.01 and MAI Illus. 35.19. He asserts that manifest injustice or miscarriage of justice resulted because it was impossible to determine what part of the jury's original $750,000 damages award was intended as compensatory damages and what part was intended as punitive damages.
Jungerman acknowledges that this claim is not preserved because he did not object to Instruction No. 12 at trial. He seeks plain error review. Rule 84.13(c) provides, "Plain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." A civil case will be reversed for plain error "only where the error is so egregious as to weaken the very foundation of the process and seriously undermine confidence in the outcome of the case." McCrainey v. Kansas City Mo. Sch. Dist. , 337 S.W.3d 746, 755 (Mo. App. W.D. 2011) (internal quotes and citation omitted). To show that an instructional error constitutes plain error, "appellant must demonstrate that the trial court so misdirected or failed to instruct the jury that it is evident that the instructional error affected the jury's verdict." Hensley v. Jackson Cty. , 227 S.W.3d 491, 497-98 (Mo. banc 2007) (internal quotes and citation omitted). Jungerman has not met this burden.
If a Missouri Approved Instruction (MAI) is applicable in a particular case, the trial court is required to give it. Rule 70.02(b); Wilson v. KAL Motel, Inc. , 524 S.W.3d 572, 574 (Mo. App. W.D. 2017). When an MAI must be modified to fairly submit the issues of the case, the instruction given "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary fact." Rule 70.02(b). If a modified MAI must be used, it must follow the applicable substantive law and be readily understood by the jury. Wilson , 524 S.W.3d at 574.
The trial court granted Jungerman's request for a bifurcated trial. Section 510.263.2 requires the jury to determine in the first stage of a bifurcated trial (1) liability for compensatory damages, (2) the amount of compensatory damages, and (3) liability of a defendant for punitive damages. If during the first stage the jury determines that the defendant is liable for punitive damages, the jury shall determine in the second stage of such trial the amount of punitive damages. § 510.263.3.
*557 MAI 10.01 is the applicable instruction for submitting punitive damages in intentional tort cases in non-bifurcated trials. It provides:
If you find the issues in favor of plaintiff, and if you believe the conduct of defendant as submitted in Instruction Number ___ (here insert number of plaintiff's verdict directing instruction) was outrageous because of defendant's evil motive or reckless indifference to the rights of others, then in addition to any damages to which you find plaintiff entitled under Instruction Number ___ (here insert number of plaintiff's damages instruction) , you may award plaintiff an additional amount of punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct.
[You may consider harm to others in determining whether defendant's conduct was outrageous. However, in determining the amount of any punitive damage award, you must not include damages for harm to others who are not parties to this case.]
Comment C to MAI 10.01 directs parties to MAI Illustration 35.19 "for an example of a submission of punitive damages in a bifurcated trial pursuant to § 510.263." Instruction Number 13 in Illustration 35.19 recommends modifying the phrase "in addition to any damages to which you find plaintiff entitled under Instruction Number ___, you may award plaintiff an additional amount of punitive damages in such sum as you believe will serve to punish defendant and to deter defendant and others from like conduct" to "you may find that defendant ... is liable for punitive damages." It also recommends adding the phrase, "If you find that defendant ... is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of trial." Then Verdict A of the Illustration advises adding the word "compensatory" before the word "damages" in the first-stage verdict form. It also suggests adding the following note and paragraph:
Note: If you found in favor of plaintiff ... and against defendant ..., complete the following paragraph by writing in the word(s) required by your verdict.
We, the undersigned jurors, find that defendant ... ________ ("is" or "is not") liable for punitive damages.
MAI 35.19 is an illustrative instruction, not a mandatory instruction. Delacroix v. Doncasters, Inc. , 407 S.W.3d 13, 36 n.16 (Mo. App. E.D. 2013). "It can not amount to reversible error in this case to fail to heed language in an illustrative instruction." Barnett v. La Societe Anonyme Turbomeca France , 963 S.W.2d 639, 654 (Mo. App. W.D. 1997), overruled on other grounds by Badahman v. Catering St. Louis , 395 S.W.3d 29, 40 (Mo. banc 2013).
Jungerman relies on the case, Advantage Bldgs. & Exteriors, Inc. v. Mid-Continent Cas. Co. , 449 S.W.3d 16 (Mo. App. W.D. 2014), in arguing that the failure to modify Instruction No. 12 according to MAI 35.19 resulted in plain error. In Advantage , this court found reversible, prejudicial error where the trial court submitted an instruction patterned after MAI 10.01 without any modification for bifurcation as suggested in MAI Illustration 35.19. Id. at 31. The instruction given during the first phase of the trial failed to change the phrase "you may award plaintiff an additional amount as punitive damages" to read "then you may find that defendant ... is liable for punitive damages." Id. at 29. Furthermore, it failed to include the phrase "If you find that defendant ... is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive *558 damages in the second stage of trial." Id. Finally, the verdict form submitted during the first stage of trial did not include the word "compensatory" before the word "damages." Id.
This court found that instructing the jury that it could award punitive damages in the first stage of the trial was a misstatement of the applicable substantive law. Id. at 30. Continuing, it explained that because the jury had no idea at the time of the first verdict that it would deliberate a second time, the verdict form further misled the jury by not clearly stating that its award must be for "compensatory" damages. Id. at 31. Thus, this court determined that the incorrect submission of the unmodified 10.01 instruction coupled with the failure to limit the word "damages" in the verdict form rendered the instruction and verdict form misleading and prejudicial. Id.
This instant case, however, differs significantly from Advantage . While the trial court failed to modify the first paragraph of Instruction No. 12 to refer to a finding of liability for punitive damages rather than to an award of punitive damages, it did include the additional paragraph suggested by Illustration 35.19, "If you find that defendant is liable for punitive damages in this stage of trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial." This paragraph expressly informed the jury that punitive damages would be addressed in two phases-a first phase addressing liability and a second phase addressing the amount of punitive damages to be awarded. Furthermore, the trial court properly modified the first-stage verdict form per 35.19 to clarify that the jury was only awarding "compensatory damages" and determining whether Jungerman was or was not liable for punitive damages during that stage. Thus, unlike in Advantage , Instruction No. 12 did not on its face cause confusion for the jury.
The amount of damages awarded by the jury in each phase of the trial further supports the conclusion that the jury was not confused about the type of damages being awarded in each phase. At trial, Harris presented medical bills totaling $226,000 and evidence of future medical care totaling $772,425. In closing arguments, Harris's attorney asked the jury to award $2 million in compensatory damages-$1 million for past and future medical and $1 million for pain and suffering. The jury awarded $750,000 in compensatory damages, less than half that requested. Then during the second stage, it awarded $5 million in punitive damages, an amount that far exceeded the amount of compensatory damages and that could only be associated with punitive damages.
Finally, unlike in Advantage , where the objections to the instructions were preserved at trial, this case involves plain error review, which places a much greater burden on Jungerman. Jungerman fails to demonstrate that the trial court so misdirected or failed to instruct the jury that it is apparent that the instructional error affected the jury's verdict. Point four is denied.
Evidentiary Rulings
The last two points addressed in this appeal challenge two evidentiary rulings. In point two, Jungerman contends that the trial court erred in excluding evidence that Harris and Wallace had used drugs on or around the day of the shooting. In point three, he asserts that that trial court erred in allowing Harris to introduce evidence, during the second phase of the trial, of two other separate incidents involving Jungerman that occurred after the shooting.
An appellate court reviews the decision to admit or exclude evidence for abuse of *559 discretion. Menschik v. Heartland Regional Med. Ctr. , 531 S.W.3d 551, 557 (Mo. App. W.D. 2017). An evidentiary ruling is an abuse of discretion if it is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. Id. A court can abuse its discretion through the inaccurate resolution of factual issues or through the application of incorrect legal principles. State v. Taylor , 298 S.W.3d 482, 492 (Mo. banc 2009) ; In re Doyle , 428 S.W.3d 755, 760 (Mo. App. E.D. 2014). Where the issue is purely a legal one, review is de novo. Id.
Jungerman first contends that the trial court erred in excluding evidence that Harris or Wallace had used drugs on or around the day of the shooting. In his motion in limine to exclude such evidence filed prior to trial, Harris admitted that he used methamphetamines and marijuana two days prior to the shooting and that Wallace used methamphetamines in the day prior to the shooting. Harris denied that he used drugs on the day of the shooting or that he was under the influence of narcotics when the shooting occurred. He also admitted that, in the emergency room, his urinalysis was positive for amphetamines and cannabinoids but argued that the drug screen did not establish when he took the drugs, the amount of drugs used, the active duration of the drugs, or the effect any drug had on him at the time of the shooting. Jungerman asserts that Harris's and Wallace's drug use was relevant and material to their ability to see, hear, perceive, and observe and related to their credibility.
Generally, the credibility of witnesses is always a relevant issue in a lawsuit. Mitchell v. Kardesch , 313 S.W.3d 667, 675 (Mo. banc 2010) ; State v. Austin , 411 S.W.3d 284, 289 (Mo. App. E.D. 2013). Impeachment is a tool to test a witness's perception, credibility, and truthfulness, which is essential because the jury is free to believe any, all, or none of the witness's testimony. Mitchell , 313 S.W.3d at 675. Thus,
[i]t has long been the rule in Missouri that on cross-examination a witness may be asked any questions which tend to test his accuracy, veracity or credibility or to shake his credit by injuring his character. He may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge.
Id. (internal quotes and citation omitted). Several methods of impeaching a witness are commonly recognized, and each method is governed by its own specific procedures and rules regarding cross-examination and the admissibility of extrinsic evidence. Id. at 675-76. These rules developed under common law to permit admission of relevant evidence affecting credibility without causing undue prejudice to the other party or diverting the jury's focus from relevant issues. Id. at 676.
The common method of impeaching a witness at issue in this case is admission of evidence showing the witness's incapacity or problems in his ability to perceive or with his memory. Id. at 675. Jungerman relies on a line of cases under this category concerning evidence of intoxication at the time of the event about which the witness testifies. Generally, evidence of the alcohol consumption and intoxication of a witness is relevant and material to his ability to see, hear, perceive, and observe. Rodriguez v. Suzuki Motor Corp. , 936 S.W.2d 104, 106 (Mo. banc 1996) ; State v. Caston , 509 S.W.2d 39, 41 (Mo. 1974) ;
*560 Spencer v. Crawford , 687 S.W.2d 243, 245-46 (Mo. App. W.D. 1985). "The intoxication of a witness as of the time the events took place which are the subject of the witness's testimony is not a collateral issue but bears directly upon the ability of the witness to accurately describe those events." Caston , 509 S.W.2d 39, 41 (Mo. 1974). Such evidence relates to the credibility of the witness regarding what transpired on the occasion in question and is admissible by either cross-examination or by separate and independent testimony. Id. ; Spencer , 687 S.W.2d at 246.
This concept has also been applied regarding the admissibility of evidence that the witness was using or under the influence of drugs at the time of the incident about which he testified. See Lagud v. Kansas City Bd. of Police Comm'rs , 136 S.W.3d 786, 793-794 (Mo. banc 2004) (where witness exhibited erratic behavior and was significantly impaired and even incoherent at time of incident in question, evidence of witness's use of "date-rape" drug, which is known to alter user's ability to perceive and recall, was relevant to capacity and competence to perceive and to impeach); State v. Oplinger , 193 S.W.3d 766, 770-71 (Mo. App. S.D. 2006) (where evidence showed that defendant had been up all night, drinking and using drugs and that he continued to consume alcohol until shortly before the crime was committed, cross-examination of defendant concerning nature, quantity, and timing of his ingestion of intoxicants before robbery was relevant to his credibility and ability to perceive the events); State v. Phillips , 939 S.W.2d 502, 504 (Mo. App. W.D. 1997) (where arresting officer found white substance in defendant's trouser pockets and defendant denied using methamphetamine, cross-examination regarding whether he was experiencing the influence of alcohol or drugs was relevant in evaluating the reasonableness and accuracy of his perceptions).
The instant case, however, is different from those cases and more in line with the fairly recent case, Secrist v. Treadstone, LLC , 356 S.W.3d 276 (Mo. App. W.D. 2011). In Secrist , defendants in a negligence case introduced evidence of plaintiff's positive drug test result for marijuana reflecting a THC level of 50 ng/ml for the purposes of comparative fault and impeachment. Id. at 279. This court explained that our case law has consistently recognized a substantive distinction between the evidence required to find that a person is impaired as a result of the ingestion of alcohol verses other drugs. Id. at 281 (citing State v. Clarkston , 963 S.W.2d 705 (Mo. App. W.D. 1998) ; State v. Friend , 943 S.W.2d 800 (Mo. App. W.D. 1997) ).
A prima facie case for impairment from alcohol has been set by statute and is established when blood alcohol concentration reaches eight-hundredths of one percent. The effects of excessive consumption of alcohol are well-known and relatively easy to identify and include, among other things, loss of balance and bloodshot eyes, and frequently is identified by its odor. Drug impairment, however, is different. Different drugs have varying effects on behavior and do not necessarily produce readily recognizable symptoms and behavior patterns.
Id. (internal quotes and citations omitted). In addressing the admissibility of the plaintiff's positive drug test result for the purposes of comparative fault, this court stated:
There must be evidence beyond the mere fact that a drug was present in someone's system in a particular quantity before a reasonable inference can be made that the person is impaired therefrom. The fact that Secrist tested positive for 50 ng/ml of THC (marijuana)
*561 means nothing without context. Certainly the average juror would have no knowledge as to what this number means as it relates to the level of impairment of the person in whose system it was found. It has been noted by other courts that THC may remain in the blood or urine for days if not weeks after marijuana use, and the physiological effects of marijuana use dissipate long before the THC leaves the system; therefore, without further evidence as to the significance of the particular levels of THC on a person's functioning, THC levels in the person's system are no indication of impairment therefrom. Also, evidence regarding abnormal behavior is not sufficient without some evidence that the behavior is consistent with identifiable symptoms of ingestion of the particular drug. Popular stereotypes regarding the characteristics and behaviors of drug users are not sufficient in a court of law. Evidence of the level of drugs in the person's system is meaningless to the layperson until there is some evidence as to what effect those levels of that drug in a person's system would be expected to have on the individual in question. Unlike with alcohol, where we have a statutory threshold that results in a presumption of impairment, no such standards currently exist with other drugs, legal or illegal. It is not the rule that any level of any drug in a person's system results in an automatic permissible inference of impairment.
Id. at 282-83 (internal citations omitted). Thus, this court determined that the trial court erred in admitting the evidence of plaintiff's THC levels for the purpose of establishing fault. Id. at 283.
This court further found that the admission of the plaintiff's THC levels for the purpose of impeachment was error. Id. at 284. It recognized the general principle that any impairment of a witness's ability to recall is relevant to his credibility. Id. at 284. It also cited a case holding that evidence that a defendant had recently ingested a pitcher of beer and may have been under its influence during the arrest and booking was relevant and admissible to impeach the defendant's alleged clear memory of the events. Id. (citing State v. Marshall , 302 S.W.3d 720, 728 (Mo. App. S.D. 2010) ). But the court reiterated that evidence that THC is in the bloodstream is not alone an indication of impairment and does not establish when the person ingested the marijuana. Id. Without more, the positive drug test result did not indicate that plaintiff was under the influence of drugs at the time of the incident about which he testified and, therefore, should not have been admitted. Id. But see State v. Selvy , 921 S.W.2d 114, 116 (Mo. App. S.D. 1996) (decided fifteen years before Secrist , where urinalysis showed defendant has used cocaine within four days before shooting, trial court did not abuse discretion in allowing state to ask defendant if he had used cocaine at time of shooting and, upon his denial, to present evidence of urinalysis).
Similar to Secrist , the excluded evidence in this case showed that Harris used methamphetamines and marijuana two days prior to the shooting and that his urinalysis in the emergency room was positive for amphetamines and cannabinoids. Harris denied that he had used drugs on the day of the shooting or that he was under the influence of narcotics when the shooting occurred. Evidence that Harris used the drugs two days before the shooting and tested positive for them in the emergency room did not alone establish that he was impaired therefrom or under their influence at the time of the shooting. Unlike the cases cited by Jungerman, no other evidence demonstrated Harris's impairment at the time. And while Wallace apparently *562 used methamphetamines on the day prior to the shooting, the record did not indicate when or how much of the drug he ingested that day. Without any evidence of Harris's or Wallace's impairment from drug use at the time of the incident, the evidence in question was not relevant to their credibility or ability to perceive or remember the events. The trial court did not abuse its discretion in excluding it. The point is denied.
Finally, in point three, Jungerman contends that trial court erred in allowing Harris to introduce evidence, during the second phase of the trial, of two other separate incidents involving Jungerman that occurred after the shooting. During the punitive damages phase, Harris elicited testimony from Jungerman on direct examination that a month after the shooting in this case, he shot two other people that he found inside the same building where the shooting in this case occurred. Jungerman also testified about an incident in June 2016 involving an ex-employee, who had worked on a farm property owned by him and lived in the bunkhouse on the property. After the employee was terminated, Jungerman told him to get out of his house. With a semi-automatic Glock firearm on his person at the time, Jungerman said to the ex-employee, "[W]hen are you getting out, motherf* * *er?" Jungerman asserts that the other incidents had no connection to his shooting of Harris and were not conduct that harmed Harris.
Punitive damages are awarded to punish a defendant for his outrageous conduct and to deter him and others like him from similar conduct. Burnett v. Griffith , 769 S.W.2d 780, 787 (Mo. banc 1989). They require a showing of a culpable mental state on the part of the defendant either by a wanton, willful, or outrageous act or reckless disregard for an act's consequences (from which evil motive is inferred). Id. The basis for punitive damages is not so much the commission of the intentional tort but the conduct or motives-the defendant's state of mind-that prompted its commission. Id.
For purposes of punitive damages, the wrongfulness of the conduct and whether it is a part of a pattern and practice of misconduct may be considered. Estate of Overbey v. Chad Franklin Nat'l Auto Sales North, LLC , 361 S.W.3d 364, 373 (Mo. banc 2012) ; Kerr v. Vatterott Educ. Ctrs., Inc. , 439 S.W.3d 802, 816 (Mo. App. W.D. 2014). While punitive damages may not be awarded to punish a defendant for wrongs done to others, a plaintiff may properly show harm to nonparties because it is relevant to show the level of reprehensibility in the defendant's conduct. Overbey , 361 S.W.3d at 379 ; Rinehart v. Shelter Gen. Ins. Co. , 261 S.W.3d 583, 597 (Mo. App. W.D. 2008). Evidence of other acts of defendant, both preceding as well as following the particular acts for which damages are sought, is admissible "if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed." Charles F. Curry & Co. v. Hedrick , 378 S.W.2d 522, 536 (Mo. 1964) (evidence that defendant let airplane sit outside for fifteen months or more without running its engines and of the resulting damage to the plane was relevant to punitive damages to show malice in the defendant's conversion of the aircraft); Kerr , 439 S.W.3d at 816 (evidence that admissions officer deceived other students into believing they were enrolling in a degree program rather than in a certificate program and that college collected more than $20,000 in student loans per several other students for years after it was notified that certificate holders were not marketable was relevant to punitive damages to show pattern and practice *563 of deception related to medical assistant program); Rinehart , 261 S.W.3d at 597 (evidence of insurance company's similar duplicitous tactics in another case to avoid paying policy limits was relevant to punitive damages as bearing upon the intent with which it later performed the similar act); Benedict v. N. Pipeline Constr. , 44 S.W.3d 410, 422 (Mo. App. W.D. 2001) (complaints filed with gas company about sinkhole problems that developed after pedestrian was injured in fall caused by sinkhole were relevant to issue of punitive damages to show a pattern of conscious disregard and reckless indifference to that type of problem). But see State ex rel. Ford Motor Co. v. Messina , 71 S.W.3d 602, 608 (Mo. banc 2002) (while recalling or failing to recall a product may illumine defendant's disposition toward that product, but the recall of different products cannot explain defendant's disposition in designing, manufacturing, or selling the offending product).
The challenged evidence was relevant to Harris's claim for punitive damages. Harris's theory during the second phase of trial was that Jungerman's conduct was outrageous in that it was an unnecessary and unreasonable level of violence against him warranting the imposition of punitive damages. The evidence of the subsequent shooting at the same building and of the incident involving the ex-employee on other property owned by Jungerman showed a pattern by Jungerman to over-react violently with firearms to any perceived threat on his property however unwarranted. The other incidents tended to show Jungerman's evil motive in, or reckless disregard for the consequences of, shooting Harris without any warning to or threat by Harris after finding him on his property. The trial court did not abuse its discretion in admitting the evidence. The point is denied.
The judgment of the trial court is affirmed.
All concur.

The facts are viewed in the light most favorable to the jury's verdict. Hayes v. Price , 313 S.W.3d 645, 648 (Mo. banc 2010).

All statutory references are to RSMo 2016 unless otherwise indicated.